QUINN EMANUEL URQUHART & SULLIVAN, LLP
MICHAEL T. ZELLER (Bar No. 196417)
  michaelzeller@quinnemanuel.com
DIANE L. CAFFERATA (Bar No. 190081)
  dianecafferata@quinnemanuel.com
DANIEL C. POSNER (Bar No. 232009)
  danposner@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Plaintiffs POP MART
Americas Inc., POP MART (Singapore)
Holding Pte. Ltd., and Beijing POP
MART Cultural & Creative Co. Ltd.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| POP MART AMERICAS INC., POP MART (SINGAPORE) HOLDING PTE. LTD., AND BEIJING POP MART CULTURAL & CREATIVE CO. LTD.<br><br>Plaintiffs,<br><br>vs.<br><br>7-ELEVEN, INC., MAYER BROTHERS GROUP, INC. (D/B/A 7-ELEVEN STORE NO. 37950), HRBS ENTERPRISES, INC. (D/B/A 7-ELEVEN STORE NO. 34765), CHITTA CHANNIN (D/B/A 7-ELEVEN STORE NO. 39569), TERA TERA, INC. (D/B/A 7-ELEVEN STORE NO. 32606), NEETTRIO INC. (D/B/A 7-ELEVEN STORE NO. 16027), SANDHU MCHENRY & MORRIS STORE, LLC, (D/B/A 7-ELEVEN STORE NO. 42272), SANDHU SE STORES INC. (D/B/A 7-ELEVEN STORE NO. 42272), AND WEST ADAMS PETROLEUM, INC. (D/B/A 7-ELEVEN STORE NO. 39807).<br><br>Defendants. | CASE NO. 2:25-cv-6555<br><br>**COMPLAINT FOR:**<br><br>**(1) FEDERAL TRADEMARK COUNTERFEITING, 15 U.S.C. § 1114**<br><br>**(2) CONTRIBUTORY FEDERAL TRADEMARK COUNTERFEITING, 15 U.S.C. § 1114**<br><br>**(3) VICARIOUS FEDERAL TRADEMARK COUNTERFEITING, 15 U.S.C. § 1114**<br><br>**(4) FEDERAL TRADEMARK INFRINGEMENT, 15 U.S.C. § 1114**<br><br>**(5) CONTRIBUTORY FEDERAL TRADEMARK INFRINGEMENT, 15 U.S.C. § 1114** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(6)  **VICARIOUS TRADEMARK INFRINGEMENT, 15 U.S.C. § 1114**

(7)  **TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN– 15 U.S.C. § 1125**

(8)  **CONTRIBUTORY TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN– 15 U.S.C. § 1125**

(9)  **VICARIOUS TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN– 15 U.S.C. § 1125**

(10) **FEDERAL TRADE DRESS INFRINGEMENT, 15 U.S.C. § 1125**

(11) **CONTRIBUTORY FEDERAL TRADE DRESS INFRINGEMENT, 15 U.S.C. § 1125**

(12) **VICARIOUS FEDERAL TRADE DRESS INFRINGEMENT, 15 U.S.C. § 1125**

(13) **UNFAIR COMPETITION, 15 U.S.C. § 1125(a)(1)**

(14) **STATE STATUTORY AND COMMON LAW UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200**

(15) **FEDERAL COPYRIGHT INFRINGEMENT, 17 U.S.C. § 101**

(16) **CONTRIBUTORY FEDERAL COPYRIGHT INFRINGEMENT, 17 U.S.C. § 101**

-ii-
COMPLAINT

**(17) VICARIOUS LIABILITY FEDERAL COPYRIGHT INFRINGEMENT, 17 U.S.C. § 101**

**JURY DEMAND**

Plaintiffs POP MART Americas Inc., POP MART (Singapore) Holding Pte. Ltd., and Beijing POP MART Cultural & Creative Co. Ltd. (collectively, "POP MART") bring this action against Defendants 7-Eleven, Inc. and seven of its California stores for injunctive relief and damages under the laws of the United States and the State of California, and allege, based on their personal knowledge as to their own actions and upon information as to the actions of others, as follows:

## INTRODUCTION

1.     POP MART designs, manufactures and distributes innovative, distinctive, and extremely popular toy experiences under the "POP MART" brand, including their popularly beloved character LABUBU, the artist-designed star of THE MONSTERS series.  The LABUBU doll and character is a global viral phenomenon, receiving recent coverage in The New York Times and The Wall Street Journal, and social media posts from or featuring celebrities and influencers such as David Beckham, Kim Kardashian, Rihanna and Cher.  In addition to innovative toy design, POP MART is also an innovator in toy presentation, offering its products in a variety of fun and exciting ways, including "blind box" presentation in stores, robotic vending machines, and official online channels, including the Pop Mart app and popmart.com.

2.     POP MART does not offer its products in 7-Eleven stores, which are well known for offering snacks and everyday necessities, but not innovative, carefully managed, artist-designed toy experiences.  POP MART has discovered that, as the LABUBU dolls' popularity exploded, 7-Eleven locations began offering counterfeit versions of many POP MART products.  The 7-Eleven products are of inferior quality, but they use identical or virtually identical copies of POP MART's trademarks, trade dress and  product and packaging design.  **Table A** below shows examples of a genuine POP MART product compared to a counterfeit product sold in a 7-Eleven store.

| Table A: Sample Comparisons of POP MART's Genuine Products and 7-Eleven Counterfeit Products | |
|---|---|
| **POP MART's Genuine Product** | **7-Eleven's Counterfeit Product** |
|  POP MART Genuine Exciting Macaron Box |  7-Eleven Counterfeit Exciting Macaron Box |
|  POP MART Genuine Exciting Macaron Doll |  7-Eleven Counterfeit Exciting Macaron Doll |

3.     POP MART brings this lawsuit to protect its intellectual property, and its business, from this counterfeiting and infringement.

# THE PARTIES

4.    Plaintiff POP MART Americas Inc. ("POP MART Americas") is a Delaware corporation with its principal place of business in Glendale, California.

5.    Plaintiff POP MART (Singapore) Holding Pte. Ltd. ("POP MART Singapore") is a Singapore company with its principal place of business in Singapore.

6.    Plaintiff Beijing POP MART Cultural & Creative Co. Ltd. ("POP MART Beijing") is a Chinese company with its principal place of business in Beijing, China.

7.    Defendant 7-Eleven, Inc. ("7-Eleven") is a Texas corporation with its principal place of business in Irving, Texas.

8.    Defendant Mayer Brothers Group, Inc. ("7-Eleven Barstow Store") is a California corporation with its principal place of business in Apple Valley, California. Mayer Brothers Group, Inc. owns 7-Eleven Store No. 37950, a 7-Eleven store located at 491 Armory Road, Barstow, California 92311.

9.    Defendant HRBS Enterprises, Inc. ("7-Eleven Flintridge Store") is a California corporation with its principal place of business in Anaheim, California. HRBS Enterprises, Inc. owns 7-Eleven Store No. 34765, a 7-Eleven store located at 1535 Foothill Boulevard, La Cañada Flintridge, California 91011.

10.    Defendant Chitta Channin ("7-Eleven Glendale Store") is a California corporation with its principal place of business in Tarzana, California. Chitta Channin owns 7-Eleven Store No. 39569, a 7-Eleven store located at 901 Central Ave., Glendale, California 91203.

11.    Defendant Tera Tera, Inc. ("7-Eleven San Diego Store") is a California corporation with its principal place of business in Los Angeles, California. Tera Tera, Inc. owns 7-Eleven Store No. 32606, a 7-Eleven store located at 9609 Aero Drive, West Canyon Ave., San Diego, California 92123.

12.    Defendant Neettrio Inc. ("7-Eleven Simi Valley Store") is a California corporation with its principal place of business in Simi Valley, California. Neettrio,

Inc. owns 7-Eleven Store No. 16027, a 7-Eleven store located at 1850 Cochran St., Simi Valley, California 93065.

13.     Defendant Sandhu McHenry & Morris Store, LLC is a California limited liability company with its principal place of business in Modesto, California. Defendant is a California corporation with its principal place of business in Ripon, California. Sandhu McHenry & Morris Store, LLC and Sandhu SE Stores Inc. (collectively, "7-Eleven Modesto Store") own 7-Eleven Store No. 42272, a 7-Eleven store located at 2133 Yosemite Blvd., Modesto, California 95354.

14.     Defendant West Adams Petroleum, Inc. ("7-Eleven Los Angeles Store") is a California corporation with its principal place of business in Los Angeles, California.  West Adams Petroleum, Inc. owns 7-Eleven Store No. 39807, a 7-Eleven store located at 1691 W Adams Blvd., Los Angeles, California 90007.

## JURISDICTION AND VENUE

15.     This action arises under 15 U.S.C. § 1114, 15 U.S.C. § 1125 and 17 U.S.C. §§ 101 *et seq*.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), as well as upon principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

16.     This Court has personal jurisdiction over each of the Defendants because each of them conducts business in and is found in this State and, furthermore, because each of them has committed the unlawful acts complained of in this State, including but without limitation selling, marketing and distributing their counterfeit and infringing goods in this State.

17.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1400(a) because the events giving rise to Plaintiffs' claims occurred and are occurring in this district and because one or more defendants resides or may be found in this district.

-4-
COMPLAINT

# FACTUAL ALLEGATIONS

## POP MART Launches LABUBU

18.    POP MART is a leading global design, toy and collectibles brand known for its vibrant, imaginative designer toys.  POP MART collaborates with talented artists and major media companies (such as Disney) to produce high-quality blind boxes and designer figures that blend art, pop culture, and storytelling.  Their unique retail experience—ranging from stylish flagship stores to fun robotic vending machines (i.e., "Roboshops")—makes collecting both exciting and accessible.  POP MART has built a passionate community of collectors worldwide, transforming art toys into a cultural phenomenon.

19.    POP MART's signature "blind box" model transforms the simple act of buying a toy into an exciting experience.  Customers purchase sealed boxes without knowing which specific POP MART character they will unbox.

20.    POP MART sells its products through its online shop, located at www.popmart.com, through the POP MART app, and in more than 550 POP MART retail stores and more than 2,500 POP MART Roboshops across more than 30 countries and regions.

21.    In September 2023, POP MART opened a theme park in Beijing, China called Pop Land.  Pop Land is an immersive world where many of POP MART's beloved characters come to life.  It offers a variety of attractions, photo opportunities, and experiences with interactive displays, performances, and souvenir shops.

22.    One of POP MART's most beloved characters is LABUBU, the quirky star from POP MART's hit THE MONSTERS series, designed by Hong Kong artist Kasing Lung.  THE MONSTERS series was inspired by Norse mythology and features a "tribe" of magical elf characters that inhabit the Nordic forests and love a bit of harmless mischief but have hearts of gold.  The elves include the LABUBU, MOKOKO, and ZIMOMO dolls and characters.

23.     First introduced in picture books in 2015, the LABUBU character's viral breakout moment came in 2023 with POP MART's vinyl plush LABUBU keychains that racked up more than 2 million #LABUBU posts on TikTok alone in the last two years[1] and appeared as the accessories of celebrities from Rihanna to Blackpink's Lisa.

24.     LABUBU dolls have been released and appeared as part of several series in THE MONSTERS line of products, including but not limited to:

    (a)     <u>Vinyl Plush Pendants - Blind Box</u>

        (i)     THE MONSTERS Exciting Macaron Series;

        (ii)     THE MONSTERS Have A Seat Series;

        (iii)   THE MONSTERS Big into Energy Series;

    (b)     <u>Figures - Blind Box</u>

        (i)     THE MONSTERS Lazy Yoga Series;

        (ii)     THE MONSTERS Wacky Mart Series;

        (iii)   THE MONSTERS Almost Hidden Series.

25.     Each LABUBU doll in the above-listed series comes in a "blind box" with distinctive, carefully designed packaging (collectively, the "LABUBU Blind Box Series").  With a blind box, the customer does not know which specific doll in the series is in the box.  To find out, the customer first must open the box itself, and either find a card inside revealing the character information, or open a sealed decorative bag inside of the box, to reveal which doll is inside.  **Table B** and **Table C** below show each of the items in certain toy series within two categories.  The **Table B** series, in the first category, are the LABUBU Vinyl Plush Pendant Blind Boxes, and the dolls within that group hang from a keychain.  The **Table C** series, in the second category, are the LABUBU Figures Blind Boxes and feature dolls without that

---

[1]  https://ads.tiktok.com/business/creativecenter/hashtag/LABUBU. Unless otherwise indicated, every hyperlink referenced herein was last visited on July 17, 2025.

feature.  In addition to the regular dolls in each series, each of the LABUBU Blind Box Series includes a "Secret" or "Mystery Guest" doll, which is shown in the red circle in each of the series' photos.  Purchase of a "Whole Set" (where the series features seven toys, for example) means the customer will receive six of the seven LABUBU characters in the series with no duplicates, and each box in the set is still "blind."

| Table B: LABUBU Vinyl Plush Pendant Blind Boxes | |
|---|---|
| 1 | THE MONSTERS Exciting Macaron Series (released on October 27, 2023)[2]  |

---

[2] https://www.popmart.com/us/pop-now/set/40.

| Table B: LABUBU Vinyl Plush Pendant Blind Boxes |
|---|

   

Soymilk    Lychee Berry    Green Grape    Sea Salt Coconut    Toffee    Sesame Bean



| **Table B: LABUBU Vinyl Plush Pendant Blind Boxes** |
|---|



THE MONSTERS Have A Seat Series
(released on July 12, 2024)[3]

SINGLE BOX — One figurine per blind box.

WHOLE SET — One figurine per blind box.

SISI    HEHE    BABA    ZIZI    QUQU    DADA

---

[3] https://www.popmart.com/us/pop-now/set/50.

| Table B: LABUBU Vinyl Plush Pendant Blind Boxes |
|---|

3 | THE MONSTERS Big into Energy Series (released on April 25, 2025)[4]



[4] https://www.popmart.com/us/pop-now/set/195.

-10-
COMPLAINT

| Table C: LABUBU Figures Blind Boxes |
|---|
| 1    THE MONSTERS Lazy Yoga Series Figures (released on August 9, 2024)[5] |



| Table C: LABUBU Figures Blind Boxes |
|---|
| 2 THE MONSTERS Wacky Mart Series Figures (released on June 13, 2025)[6]  |

---

[5] https://www.popmart.com/us/pop-now/set/67.

[6] https://www.popmart.com/us/products/2771/THE-MONSTERS-Wacky-Mart-Series-Figures#.

3

THE MONSTERS Almost Hidden Series Figures
(released on April 12, 2024)[7]



26.     In addition to the LABUBU Blind Box Series, POP MART offers individual vinyl plush pendants, larger vinyl plush dolls (approximately 22.8 inches tall, sometimes with different costumes), MEGA LABUBU TEC 1000% All About Us dolls (approximately 31.2 inches tall), as well as a wide range of merchandise featuring LABUBU and other characters in THE MONSTERS series, such as phone cases, refrigerator magnets, mugs, wireless chargers, shoulder or messenger bags, pillows and display containers.  **Table D** below includes THE MONSTERS products that are sold in "non-blind" boxes.

| **Table D: Examples of "Non-Blind" Box Products in THE MONSTERS Line of Products** | |
| --- | --- |
| 1 | THE MONSTERS – I FOUND YOU Vinyl Plush Doll (ZIMOMO)[8]   |

---

7  https://www.popmart.com/us/pop-now/set/43.

8  https://www.popmart.com/us/products/878/THE-MONSTERS---I-FOUND-YOU-Vinyl-Face-Doll.

| Table D: Examples of "Non-Blind" Box Products in THE MONSTERS Line of Products |
| --- |
|  |

| 2 | THE MONSTERS - ANGEL IN CLOUDS Vinyl Plush Doll[9] |
| --- | --- |
| |  |

| Table D: Examples of "Non-Blind" Box Products in THE MONSTERS Line of Products | |
|---|---|
| 3 | THE MONSTERS – other vinyl plush dolls[10] |

10 https://www.popmart.com/us/products/578/LABUBU-Time-to-chill-Vinyl-Plush-Doll; https://www.popmart.com/us/products/676/THE-MONSTERS---DRESS-BE-LATTE-Vinyl-Plush-Doll; https://www.popmart.com/us/products/890/THE-MONSTERS---BEST-OF-LUCK-Vinyl-Plush-Doll; https://www.popmart.com/us/products/1012/LABUBU-%C3%97-PRONOUNCE-BE-FANCY-NOW-Vinyl-Plush-Doll; https://www.popmart.com/us/products/1060/THE-MONSTERS-FALL-IN-WILD-SERIES-Vinyl-Plush-Doll; https://www.popmart.com/us/products/1371/THE-MONSTERS---FLIP-WITH-ME-Vinyl-Plush-Doll; https://www.popmart.com/us/products/1898/THE-MONSTERS-Let's-Checkmate-Series-Vinyl-Plush-Doll.

| Table D: Examples of "Non-Blind" Box Products in THE MONSTERS Line of Products | |
| --- | --- |
| 4 | MEGA LABUBU TEC 1000% All About Us Dolls[11]  |
| 5 | Examples of merchandise in THE MONSTERS Line of Products[12] |

| Table D: Examples of "Non-Blind" Box Products in THE MONSTERS Line of Products |
|---|
|  |

27. Due to the phenomenal success of LABUBU dolls and products, POP MART has more than doubled its 2023 revenue to $1.8 billion in 2024, with plush toys showing a surge in sales of over **1200%** in 2024 as compared to 2023[13]—a trend that is only increasing in 2025 so far.

https://www.popmart.com/us/products/2006/THE-MONSTERS-Let's-Checkmate-Series-Mug; https://www.popmart.com/us/products/2878/THE-MONSTERS-Wacky-Mart-Series-Pillow-(Chips); https://www.popmart.com/us/products/2778/THE-MONSTERS-Wacky-Mart-Series-Messenger-Bag; https://www.popmart.com/us/products/2281/THE-MONSTERS-Big-into-Energy-Series-Phone-Case; https://www.popmart.com/us/products/2282/THE-MONSTERS-Big-into-Energy-Series-Wireless-Charger.

[13] https://economictimes.indiatimes.com/news/international/business/how-chinas-labubu-became-pop-marts-1-8-billion-plush-powerhouse/articleshow/121632411.cms.

28.    POP MART's intellectual property includes dozens of other popular characters in addition to the LABUBU character. These include (1) the MOLLY and SPACE MOLLY character, depicted as a blue-eyed girl with short hair and a pouting expression, which was envisioned by artist Kenny Wong in 2006 and debuted with POP MART in 2016; (2) the emotionally expressive CRYBABY character, designed by artist Mod-Nisa Srikamdee; (3) the HIRONO character, which was created by artist Lang and aims to highlight the subtle changes in life and its ups and downs; (4) the charismatic SKULLPANDA character, which was created by artist Xiongmiao and is characterized by its gender-fluid appearance, blasé facial expression and focus on personality; and (5) the vivacious PEACH RIOT girl band created by artist Libby Frame and characterized by their keen eye for fashion.  Examples of POP MART's MOLLY, CRYBABY, HIRONO, SKULLPANDA and PEACH RIOT products are included in **Table E** below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Table E: Examples of MOLLY, CRYBABY, HIRONO, SKULLPANDA and PEACH RIOT Blind Box Series Products |
|---|

MEGA SPACE MOLLY 100% Series 2-B
(released on August 11, 2023)[14]



SINGLE BOX                         WHOLE SET

MEILIN PANDA       JEAN-MICHEL       MINT CHOCOLATE
                   BASQUIAT

PINK PANTHER      PATRICK STAR      HEARTBEAT      GLACIER      BANANA 2017

META
The probability of drawing the secret figurine in this series is 1/54.

CHEER          BIRTHDAY          WISH
BEAR             BEAR             BEAR

MELTING
The probability of drawing the secret figurine in this series is 1/108.

---

[14]  https://www.popmart.com/us/pop-now/set/132.

COMPLAINT

| Table E: Examples of MOLLY, CRYBABY, HIRONO, SKULLPANDA and PEACH RIOT Blind Box Series Products |
|:---:|
| CRYBABY Crying Parade Series<br>(released on June 17, 2022)[15] |

 

**SINGLE BOX**
One figurine per blind box.

**WHOLE SET**
One figurine per blind box.



PEACE PLEASE      KEEP GO GO      FALL      YES!CAN CAN      THE LETTER      UGLY DUCKLING

THE DRUMMER      GOOD GIRL      MONKEY      THE TRUMPET      FREE LION      LONG LEGGED CLOWN



---

[15] https://www.popmart.com/us/pop-now/set/287.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Table E: Examples of MOLLY, CRYBABY, HIRONO, SKULLPANDA and PEACH RIOT Blind Box Series Products |
| --- |
| HIRONO Shelter Series<br>(released on July 19, 2024)[16] |





---

[16]  https://www.popmart.com/us/products/1385/Hirono-Shelter-Series-Figures.

| Table E: Examples of MOLLY, CRYBABY, HIRONO, SKULLPANDA and PEACH RIOT Blind Box Series Products |
|---|
| SKULLPANDA L'impressionnisme Series Plush Doll (released on June 6, 2025)[17] |








---

[17] https://www.popmart.com/us/products/2766/%CE%B8SKULLPANDA-L'impressionnisme-Series-Plush-Doll.

| Table E: Examples of MOLLY, CRYBABY, HIRONO, SKULLPANDA and PEACH RIOT Blind Box Series Products |
|---|

Peach Riot Rush Hour Series Figures
(released on February 21, 2025)[18]




**SINGLE BOX**          **WHOLE SETS**







Gigi - Diner    Frankie - Barista    Poppy - Ice Cream Parlor    Gigi - Mail Delivery    Frankie - Tutor    Poppy - Receptionist





Gigi - HouseKeeping    Frankie - Autoshop    Poppy - Scientist    Gigi - Cat Walker    Frankie - Camp Counselor    Poppy - Life Guard

SECRET EDITION

**Frankie - Streamer**

The probability of drawing the secret figurine in this series is **1/144.**



---

18  https://www.popmart.com/us/pop-now/set/174.

## POP MART's Intellectual Property Rights

29.    As detailed further below, POP MART holds multiple intellectual property rights in the LABUBU products included in the LABUBU Blind Box Series and Non-Blind Box THE MONSTERS Products, and in the boxes, bags, and/or display trays that comprise their packaging (the "LABUBU Products").   These include, without limitation, registered federal trademark rights in the POP MART, LABUBU and THE MONSTERS marks, and common law trademark rights; unregistered federal trade dress rights in the design and appearance of the LABUBU Products; and U.S. copyright registrations protecting product and packaging designs in the LABUBU Blind Box Series.

## POP MART's Trademark Rights

30.    POP MART is the owner of numerous trademarks registered with the United States Patent and Trademark Office, including those listed in **Table F** (the "POP MART Registered Marks").  Plaintiffs POP MART Singapore and POP MART Beijing are the registrants for the marks listed in **Table F**.  POP MART Americas is a POP MART affiliate in the United States, headquartered in Glendale, California, and licenses POP MART's intellectual property in the United States and distributes POP MART products in the United States (including products bearing the trademarks identified below), and engages in other commercial activity in the United States on POP MART's behalf.

| Table F: Trademark Registrations | | |
|---|---|---|
| **Trademark Registration No.** | **Mark** | **First Use in Interstate Commerce** |
| 5166916 |  | At least as early as March 21, 2014 |

| Table F: Trademark Registrations | | |
|---|---|---|
| **Trademark Registration No.** | **Mark** | **First Use in Interstate Commerce** |
| 6592820 | **POP MART** | Not applicable; basis for filing: 44(e) foreign application |
| 7575792 | POP MART | Not applicable; basis for filing: 44(d) foreign application |
| 7839144 | LABUBU | Not applicable; basis for filing: Sect. 66(a) (Madrid Protocol) |
| 7839156 | THE MONSTERS | Not applicable; basis for filing: Sect. 66(a) (Madrid Protocol) |

31.     POP MART's federal trademark registrations provide, at the very least, constructive notice to Defendants of POP MART's rights in the marks.

32.     By virtue of its extensive and continuous use of the marks in U.S. commerce, POP MART also has common law rights in the POP MART trademarks since at least as early as 2019 (and 2010 internationally), and in the LABUBU and THE MONSTERS trademarks since at least as early as 2019 (and 2016 internationally).  *See* **Table F**.  Similarly, by virtue of its extensive and continuous use of the marks in commerce, POP MART has common law trademark rights in its EXCITING MACARON and ZIMOMO trademarks since at least as early as 2023; its HAVE A SEAT, LAZY YOGA, and ANGEL IN CLOUDS trademarks since at least as early as 2024; and its BIG INTO ENERGY trademark since at least as early as 2025.  For ease of reference, POP MART will refer to the EXCITING MACARON, ZIMOMO, HAVE A SEAT, LAZY YOGA, ANGEL IN CLOUDS, and BIG INTO ENERGY marks, together with the POP MART Registered Marks, collectively as the "POP MART Marks."  Each of the referenced trademarks was registered and/or used

in interstate commerce by POP MART before Defendants used any of them for their counterfeits. Further, POP MART has sold products bearing each of the POP MART Marks to customers in California via its website https://www.popmart.com/us and POP MART stores in California, as well as throughout the United States.

33. The POP MART Marks include: (i) a square containing the stylized terms "POP MART" with "POP" appearing above "MART"; (ii) the stylized wording "POP MART" with a shaded rectangle; (iii) the characters "POP MART" without any particular font style, size, or color; (iv) the wording "THE MONSTERS" underneath a stylized silhouette of an elf lying down on the word "MONSTERS"; (v) the characters "LABUBU" without any particular font style, size, or color; (vi) the stylized words "EXCITING MACARON" with the text "EXCITING" above "MACARON"; (vii) the characters "EXCITING MACARON" without any particular font style, size, or color; (viii) the stylized words "BIG INTO ENERGY" with the text "BIG INTO" above "ENERGY"; (ix) the characters "BIG INTO ENERGY" without any particular font style, size, or color; (x) the stylized words "HAVE A SEAT" with the text "A" between and slightly below "HAVE" and "SEAT"; (xi) the characters "HAVE A SEAT" without any particular font style, size, or color; (xii) the stylized words "LAZY YOGA" with the text "LAZY" above "YOGA"; (xiii) the characters "LAZY YOGA" without any particular font style, size, or color; and (xiv) the characters "ZIMOMO" without any particular font style, size, or color.

34. POP MART has established valuable trademark rights and goodwill in the POP MART Marks by virtue of its extensive use and registration of the trademarks, its substantial promotional and marketing efforts under the trademarks, its expenditure of vast sums in advertising and promotional activities under the trademarks, and its third-party licensing agreements.

35. The products offered, sold, and advertised in connection with THE MONSTERS series (including LABUBU) have generated substantial revenue—in 2024, in excess of $420 million internationally, and $34 million in the United States

specifically, contributing to over $1.8 billion overall revenue achieved in connection with the POP MART trademark in that year.[19]

36.    As a result of POP MART'S extensive use of the trademarks and the significant sales, promotion, advertising, third-party licensing and commercial success of the products using the POP MART Marks, the POP MART Marks have achieved such widespread public exposure and recognition that they have acquired secondary meaning and indeed are widely recognized among the general consuming public.  In addition, the POP MART Marks do not describe POP MART's goods or services, but instead are arbitrary and fanciful, and therefore inherently distinctive and afforded the greatest protection under the law.

### POP MART's Federal Unregistered Trade Dress Rights in
### LABUBU Plush Dolls

37.    POP MART owns federal unregistered trade dress rights in the design and appearance of the LABUBU plush dolls, which include the LABUBU, MOKOKO, and ZIMOMO plush dolls in the above-listed LABUBU Blind Box Series and Non-Blind Box THE MONSTERS Products (the "LABUBU Plush Dolls").

38.    The LABUBU trade dress ("LABUBU Trade Dress") consists of the following cohesive design elements of the LABUBU Plush Dolls, which create a highly distinctive visual identity that sets them apart in the vinyl plush toy market: (i) a wide mouth that stretches almost to the ears, with an exaggerated grin that reveals nine sharp little white teeth, with the fourth and fifth teeth centered; (ii) contrasting with the wide-grinning mouth, it has a prominent brow, overhanging the top of the eyes, giving the impression of a constant "frowning" expression in the eyes; (iii) eyes that are slender, oval shaped vertically, and also vertically aligned, and that are one eye width apart; (iv) a nose that is a small flat upside-down rounded triangle; (v) two

---

[19] https://prod-out-res.popmart.com/cms/ANNUAL_REPORT_2024_976e7e443e.pdf.

closely spaced, ovoid ears that narrow at the top to a rounded point sticking up from the top of the head; (vi) a plump and oval-shaped body, with two short, rounded arms that each have a hand with four fingers and with two feet that each have three, claw-shaped toes, all of which combine to create a fairy-tale or fantasy creature appearance (collectively, "the LABUBU Plush Dolls Design Elements" or the "Elements"). These Elements are reflected in each of the LABUBU Plush Dolls, with the variation among them principally limited to a mix of vibrant and more neutral body colors, different facial expressions and different eye, inner ear, and nose colors.  The Elements also are reflected on the copyright-protected packaging, which features detailed visual renderings of the LABUBU Plush Dolls on both the outer box and the inner bag.  Some are presented as keychain attachments, but with the same Elements. **Table G** depicts examples of LABUBU Plush Dolls bearing the LABUBU Trade Dress.

| Table G: Examples of POP MART's LABUBU Trade Dress |
|:---:|
|  |
| THE MONSTERS Exciting Macaron Vinyl Face Blind Box-Green Grape |

| Table G: Examples of POP MART's LABUBU Trade Dress |
|:---:|
|  |
| THE MONSTERS Big into Energy Series Vinyl Plush Pendant Blind Box-LOVE |
|  |
| THE MONSTERS Exciting Macaron Vinyl Face Blind Box-Chestnut Cocoa |

39.     By and through the unique and distinctive aesthetic and widespread market adoption of the LABUBU Plush Dolls, supported by POP MART's comprehensive marketing campaigns, media attention and significant social media presence, the LABUBU Trade Dress is uniquely distinctive to POP MART and is

identifiable as such to consumers.  This distinctive trade dress represents significant commercial value and brand recognition, serving as a symbol of POP MART's reputation and quality in the marketplace.

40.    Through extensive use, marketing and consumer recognition over the last five years, the LABUBU Trade Dress has acquired secondary meaning and is distinctly associated with POP MART as the source of LABUBU Products.  POP MART has invested substantial resources in advertising and promoting products bearing the LABUBU Trade Dress, including over $2 million in advertising expenditures and over 4.8 million units sold nationwide since the beginning of 2024. The LABUBU Trade Dress has been featured prominently in POP MART's marketing campaigns, product packaging and promotional materials distributed throughout the United States and California, including through POP MART's official online platforms.  As a result of this extensive use and promotion, consumers have come to recognize and associate the LABUBU Trade Dress exclusively with POP MART.

41.    This consumer recognition is evidenced by extensive media coverage and virality on social media, as described in more detail *infra*.  POP MART's products from THE MONSTERS series have achieved significant commercial success and market recognition, with annual sales in the United States in excess of $34 million in 2024.  The LABUBU Trade Dress has become a valuable identifier of POP MART's products in the minds of consumers and serves as a guarantee of quality and source.[20]

42.    The LABUBU Trade Dress presents a nonfunctional look and feel that is uniquely associated with POP MART's LABUBU Plush Dolls.  The aesthetic features of the LABUBU Trade Dress do not have utilitarian functionality, as evidenced by the following:

---

[20] https://prod-out-res.popmart.com/cms/ANNUAL_REPORT_2024_976e7e443e.pdf.

(a) The LABUBU Plush Dolls Design Elements yield no utilitarian advantage over other vinyl plush toys;

(b) There are innumerable alternative stylistic vinyl plush toys available in the market, including but not limited to (i) countless alternative plush toy body shapes; (ii) numerous alternative means to depict facial features; and (iii) alternative ear and limb shapes;

(c) POP MART does not market or advertise any claimed utilitarian advantages of the LABUBU Trade Dress; and

(d) The LABUBU Trade Dress is not the result of comparatively simple or inexpensive methods of manufacture vis-à-vis other vinyl plush toys.

43.    The LABUBU Trade Dress lacks aesthetic functionality because protecting this specific combination of design elements (1) protects only POP MART's source-identification and reputation, and (2) would not create a competitive disadvantage based on factors other than source-identification.  Competitors have successfully used numerous alternative design elements and combinations for their own products, demonstrating that the LABUBU Trade Dress does not serve a purely aesthetic function independent of source identification.  Rather, the LABUBU Trade Dress was specifically designed to distinguish the source of LABUBU Products from other products and has successfully had that effect.  Any competitive advantage from these aesthetic features stems from POP MART's reputation, because POP MART's distinctive combination of features has become associated in the minds of consumers with high-quality products originating from a single source—POP MART.

### POP MART's Copyright Registrations

44.    POP MART Beijing is the owner of registered copyrights in and related to its LABUBU artworks, including the works listed in **Table H** below (the "POP MART Copyrighted Works").

| Table H: POP MART Copyrighted Works | |
|---|---|
| **Copyright Registration No.** | **Deposit Copies of Copyrighted Work and Title of Copyright** |
| VA0002452124 |   THE MONSTERS - Exciting Macaron - Boxes |
| VA0002452141 | |

| Table H: POP MART Copyrighted Works | |
|---|---|
| **Copyright Registration No.** | **Deposit Copies of Copyrighted Work and Title of Copyright** |
| | <br>THE MONSTERS - Exciting Macaron - Packing Bags |
| VA0002451895 | <br>THE MONSTERS - Exciting Macaron Vinyl Face Blind Box-Chestnut Cocoa |
| VA0002424972 | <br>Have a Seat Box |

| Table H: POP MART Copyrighted Works | |
|---|---|
| **Copyright Registration No.** | **Deposit Copies of Copyrighted Work and Title of Copyright** |
| VA0002424793 |  Have a Seat Bag |
| VA0002451935 |  THE MONSTERS - Have a Seat Vinyl Plush Blind Box-DUODUO |
| VA0002451927 |  THE MONSTERS - Have a Seat Vinyl Plush Blind Box-HEHE |

| Table H: POP MART Copyrighted Works | |
|---|---|
| **Copyright Registration No.** | **Deposit Copies of Copyrighted Work and Title of Copyright** |
| VA0002451857 | <br>THE MONSTERS - Have a Seat Vinyl Plush Blind Box-ZIZI |

COMPLAINT

| Table H: POP MART Copyrighted Works | |
|---|---|
| **Copyright Registration No.** | **Deposit Copies of Copyrighted Work and Title of Copyright** |
| VA0002452119 |  THE MONSTERS Big into Energy Series-Boxes |

| Table H: POP MART Copyrighted Works | |
|---|---|
| **Copyright Registration No.** | **Deposit Copies of Copyrighted Work and Title of Copyright** |
| VA0002452126 | <br>THE MONSTERS Big into Energy Series-Packing Bags |
| VA0002448371 | <br>THE MONSTERS Big into Energy Series-Vinyl Plush Pendant Blind Box-LOVE |

| Table H: POP MART Copyrighted Works | |
|---|---|
| **Copyright Registration No.** | **Deposit Copies of Copyrighted Work and Title of Copyright** |
| VA0002452110 |  THE MONSTERS Lazy Yoga Series-Ab Roller |
| VA0002452114 |  THE MONSTERS Lazy Yoga Series-Americano |
| VA0002452102 |  THE MONSTERS Lazy Yoga Series-Confident |

| Table H: POP MART Copyrighted Works | |
|---|---|
| **Copyright Registration No.** | **Deposit Copies of Copyrighted Work and Title of Copyright** |
| VA0002452112 |  THE MONSTERS Lazy Yoga Series-Lay Down |
| VA0002452115 |  THE MONSTERS Lazy Yoga Series-Little Bird |
| VA0002452099 |  THE MONSTERS Lazy Yoga Series-Show Off |

| Table H: POP MART Copyrighted Works | |
|---|---|
| **Copyright Registration No.** | **Deposit Copies of Copyrighted Work and Title of Copyright** |
| VA0002452117 |  THE MONSTERS Lazy Yoga Series-Sleeping |
| VA0002452107 |  THE MONSTERS Lazy Yoga Series-Stretch Out |
| VA0002452111 |  THE MONSTERS Lazy Yoga Series-Sweating |

| Table H: POP MART Copyrighted Works | |
|---|---|
| **Copyright Registration No.** | **Deposit Copies of Copyrighted Work and Title of Copyright** |
| VA0002452118 | <br><br>THE MONSTERS Lazy Yoga Series-Yoga Coach |
| VA0002452079 | <br><br>THE MONSTERS Lazy Yoga Series-Zone Out |

| Table H: POP MART Copyrighted Works | |
|---|---|
| **Copyright Registration No.** | **Deposit Copies of Copyrighted Work and Title of Copyright** |
| VA0002448155 |  THE MONSTERS - ANGEL IN CLOUDS Vinyl Face Doll |
| VA0002450708 |  FALL INTO SPRING-Vinyl Plush Doll |
| VA0002451839 |  THE MONSTERS Classic Series-LABUBU Figure (Brown) |

-43-
COMPLAINT

| Table H: POP MART Copyrighted Works ||
| Copyright Registration No. | Deposit Copies of Copyrighted Work and Title of Copyright |
| VA0002451849 |  LABUBU Timber Workshop Series-Playing on the Swing Plus Pendant Blind Box |

## **LABUBU Products Are Distinctive and Popular**

45.    As discussed *supra,* due to POP MART's distinctive designs, extensive marketing efforts and widespread media coverage, the LABUBU Trade Dress has acquired distinctiveness in the marketplace.  As a result of POP MART's widespread promotional activities, consumers have come to recognize and associate vinyl plush toys bearing the LABUBU Trade Dress with high-quality goods originating from a single source—POP MART.  The LABUBU Trade Dress has therefore developed substantial goodwill and consumer recognition, symbolizing POP MART's valuable reputation in the marketplace.

46.    The LABUBU Trade Dress is widely recognized and beloved by consumers.  For example, in the United States the hashtag #LABUBU has been used in approximately 270,000 TikTok posts in the last 30 days, and in more than two million posts overall.[21]   The same hashtag has been used on Instagram in approximately 1.4 million posts, and on Facebook in approximately 2 million posts.[22]

---

[21]  https://ads.tiktok.com/business/creativecenter/hashtag/labubu/pc/en?rid=tpnju7ri32i.

[22]  https://www.facebook.com/hashtag/LABUBU.

47.    Due to LABUBU's massive success, POP MART reported revenue of more than $1.8 billion in 2024.[23]  During this year alone, through May 2025, revenues generated by Exciting Macarons, Have A Seat, and Big into Energy (launched April 2025) have exceeded $43 million.

48.    LABUBU Products have been featured in many news outlets throughout California, the United States and the world, including major publications such as The New York Times, The Wall Street Journal, BBC, Forbes, NBC News, Vogue, Teen Vogue, CNN, NPR, The Guardian, and others.  In a June 21, 2025 article, CNN described LABUBU dolls as a "cultural and commercial phenomenon."[24]  Similarly, The New York Times and BBC have described LABUBU dolls as a "global craze" and "global sensation."[25]  News outlets have compared the  popularity of LABUBU Products to that of the Cabbage Patch Kids in the 1980s, or Tamagatchis and Beanie Babies of the 1990s.[26]  Forbes, on June 27, 2025, compared the popularity of LABUBU Products to that of Pokemon.[27]

49.    Compounding LABUBU's fame, celebrities such as Lisa of Blackpink, Cher, Rihanna, Kim Kardashian, David Beckham, Dua Lipa, Twinkle Khanna, Ananya Panday and Sharvari have posted about or been spotted with LABUBU dolls. Pop star and musician Lisa, who has more than 100 million Instagram followers, has posted numerous images with LABUBU dolls, such as the Instagram story from April 2025 depicted in **Figure 1**.

---

[23]  https://www.bbc.com/news/articles/cy4ydxlm9n9o; https://prod-out-res.popmart.com/cms/ANNUAL_REPORT_2024_976e7e443e.pdf.

[24]  https://www.cnn.com/2025/06/21/us/labubu-doll-plushie-pop-mart-dg.

[25]  https://www.nytimes.com/2025/06/16/world/asia/labubu-china-cool.html; https://www.bbc.com/news/articles/cy4ydxlm9n9o.

[26]  https://www.theguardian.com/commentisfree/2025/may/15/a-fluff-ball-with-a-monster-face-what-explains-the-luxury-appeal-of-labubu-dolls.

[27]  https://www.forbes.com/sites/danidiplacido/2025/06/27/how-labubu-dolls-took-over-the-internet/.

-45-
COMPLAINT



**Figure 1**

50.     Former professional soccer player David Beckham—who has around 88 million Instagram followers—made global headlines in May 2025 when he posted a photo on his Instagram story to share that his daughter had gifted him a LABUBU doll.  A screenshot of this story is included as **Figure 2** below.

**Figure 2**

51.     Kim Kardashian, one of the most followed persons on Instagram with around 356.5 million followers, also showed off her LABUBU doll collection in April 2025.  A screenshot of her Instagram story is included as **Figure 3** below.

**Figure 3**

52. Other celebrities have made headlines when they were spotted in public with LABUBU keychains. A photo of Rihanna from May 2025 with a LABUBU keychain is included as **Figure 4**,[28] and a Paper Magazine Instagram post of Cher with a LABUBU keychain at the Tribeca Film Festival on June 16, 2025 is included as **Figure 5**.[29] The headline of Paper Magazine's Instagram post in Figure 5 reads "@cher and her Labubu might be the cutest thing we've seen like, ever!"

---

[28] https://www.thesun.co.uk/tvandshowbiz/35109700/celebrities-show-off-labubu-dolls/.

[29] https://www.instagram.com/p/DK966bFO_7O/?utm_source=ig_web_copy_link.

1
2
3
4
5
6
7
8
9
10
11



**Figure 4**

12
13
14
15
16
17
18
19
20
21
22



**Figure 5**

23    53.    As NPR put it in a June 18, 2025 article, LABUBU dolls have "become

24  a global sensation—sparking long lines outside toy stores, selling out online within

25  minutes, and listing for double or triple their original price on resale markets."[30]

26

27

28
_____
[30] https://www.npr.org/2025/06/18/g-s1-72939/what-is-LABUBU-pop-mart-explained.

Indeed, LABUBU dolls sell out in seconds online on POP MART's website. Devoted customers wait in long lines outside stores worldwide, with buyers camping out for hours in front of POP MART stores. The global craze around LABUBU dolls has, as NPR notes, "sparked markets" for "counterfeit LABUBU dolls, which are sometimes called 'Lafufus.'"[31]

### 7-Eleven

54.    7-Eleven is a multinational chain, and the world's largest franchisor of retail convenience stores, operating nearly 1,900 retail convenience stores in California alone, including but not limited to the 7-Eleven Barstow Store, the 7-Eleven Flintridge Store, the 7-Eleven Glendale Store, the 7-Eleven San Diego Store, the 7-Eleven Simi Valley Store, the 7-Eleven Modesto Store, and the 7-Eleven Los Angeles Store (collectively, the "7-Eleven Stores").

55.    7-Eleven operates under a hybrid business model that includes both corporate-owned and franchise-operated stores. Corporate stores are owned and operated directly by 7-Eleven, with corporate-hired managers and employees, and generate revenue that goes directly to 7-Eleven. 7-Eleven uses corporate stores as, among other things, laboratories for testing new products and retail techniques. Franchise stores are owned and operated by franchisees that, while they may have some operational autonomy, operate with oversight and support from the 7-Eleven corporate infrastructure.

56.    Under the 7-Eleven Franchise Agreement, 7-Eleven leases property and equipment to the franchisee and grants a license to use 7-Eleven's trademarks and operating system. In return, franchisees must pay 7-Eleven a franchise fee and other fees, along with the "7-Eleven Charge," which is typically 50% of the gross profits of the store. Franchisees retain remaining gross profits from their store after paying the "7-Eleven Charge," fees, and store expenses.

---

[31] *Id.*

57.    7-Eleven requires each store, including franchise stores, to carry certain 7-Eleven branded products and to use the 7-Eleven marks and packaging.[32]  In addition, while 7-Eleven allows franchisees "to stock their stores with the products their communities are asking for," 7-Eleven still maintains oversight of and ultimate control over what products are sold at each store.[33]

58.    7-Eleven provides and leases each franchisee a fully equipped and stocked 7-Eleven location that is ready for operation.

59.    7-Eleven requires all stores to use a computer system, known as the "ISP" to handle ordering merchandise.  7-Eleven also schedules all deliveries of merchandise to the stores.

60.    7-Eleven utilizes "technology that tracks in-demand products" at franchises called "Business Transformation" or "BT."[34]  Specifically, 7-Eleven's website advertises that its technology "can help keep [franchisees'] shelves stocked with what sells best at each location so [franchisees] don't waste valuable time and money trying to figure it out."[35]  Business Transformation makes individualized, store-specific recommendations to franchisees regarding the amount of product needed at the store based on sales history.

61.    In an interview video titled "Day in the Life of a 7-Eleven Franchisee" posted on 7-Eleven's website, a franchisee explained that franchisees do "back office work" on a daily basis involving "inventory accuracy"—meaning "what [they] received; did [they] actually receive it."[36]  He also explained that franchisees get "certain reports from 7-Eleven" regarding inventory.

---

[32] https://franchise.7-eleven.com/franchise/faq.

[33] *Id.*

[34] https://franchise.7-eleven.com/franchise/faq.

[35] https://franchise.7-eleven.com/franchise/innovation.

[36] https://franchise.7-eleven.com/franchise/the-brand; https://www.youtube.com/watch?v=2njRxR82Y9Y.

62.     In another interview video titled "Make a bigger impact with technology designed to help you grow" on 7-Eleven's website, a franchisee explained a technology process 7-Eleven uses called "guided replenishment," which "automatically forecasts and brings merchandise in."[37]  Later in the interview, the franchisee further explained that franchise stores use centralized, automated systems that track inventory and deliveries.  Specifically, the franchisee explained "[i]f we were to receive a delivery, we would just use this to scan the items as they come in."[38]

63.     Accordingly, 7-Eleven knows which products franchise stores are selling, helps franchise owners determine which products to sell, and supplies them with those products.

64.     7-Eleven maintains control and approval over which categories of products, and which specific products, franchise stores offer, mandates the use of 7-Eleven's centralized system to order products, and has the right—and exercises the right—to conduct audits of franchise stores, including of the products franchise stores offer.

65.     Specifically, franchisees are required to purchase at least 85% of their merchandise from 7-Eleven recommended vendors, with whom 7-Eleven negotiates the contracts.  7-Eleven controls who is a "recommended vendor" and who is not.  If franchisees do not purchase at least 85% of their merchandise from 7-Eleven recommended vendors, they must pay a fee.

66.     7-Eleven assigns each store a field consultant who visits the stores approximately once a week to evaluate and make recommendations on aspects of the store such as cleanliness and product placement.  Field consultants track customer complaints submitted to 7-Eleven, follow up with franchisees about problems

---

[37] https://franchise.7-eleven.com/franchise/the-brand; https://www.youtube.com/watch?v=vgfGH3q3N-o.

[38] *See id.*

identified by "mystery shoppers" that 7-Eleven sends every month to rate the store on certain criteria, and communicate with franchisees when they are in violation of 7-Eleven procedures.

67.    7-Eleven conducts quarterly audits of merchandise and charges stores for any missing merchandise.

68.    Despite its rights and ability to control and exercise approval over franchisees, 7-Eleven has failed to utilize this control to prevent and stop the counterfeiting and infringement of POP MART's trademarks, trade dress and copyrights.

### **Defendants' Unlawful Conduct**

69.    7-Eleven and the other Defendants have engaged in trademark and trade dress counterfeiting and infringement by selling, displaying, distributing and marketing products and packaging that are identical or virtually identical and confusingly similar to the POP MART Marks and the LABUBU Trade Dress, and furthermore have engaged in copyright infringement by displaying, distributing and selling products and packaging that are identical or virtually identical to and are substantially similar to the POP MART Copyrighted Works (collectively, the "7-Eleven Counterfeit Products").

70.    Most, if not all, of the 7-Eleven Counterfeit Products are of poor quality and unsightly.  This includes, but is not limited to, the counterfeit products having (1) eyes that have popped out or are poorly secured, creating a disturbing and also unsafe product; (2) substandard fur stitching with loose threads and uneven seams; (3) deformed, lopsided head shapes; (4) heads or hands that come off; and even (5) upside down faces, as described and demonstrated in more detail *infra*.

### **Social Media Evidence of 7-Eleven Counterfeit Products**

71.    Videos show unsuspecting buyers driving out of their way to a 7-Eleven store in hopes of purchasing a genuine POP MART LABUBU doll and unboxing what they believed to be authentic merchandise, only to discover they were counterfeits,

featuring poor-quality materials, misspelled brand names and/or packaging inconsistencies.  As noted above, there is even a neologism coined for this counterfeit phenomenon—many videos and social media posts refer to these 7-Eleven Counterfeit Products as "Lafufus."

72.    The videos and posts demonstrate that the 7-Eleven Counterfeit Products have caused actual consumer confusion about whether the buyer purchased a legitimate POP MART product.

73.    For example, on or about June 21, 2025, a TikTok user by the name of "cali.hunny" posted a video on TikTok that was approximately two minutes long with the caption "Idk what i got myself into but she a fake #LABUBU don't buy them from 711!!!  #blindbox #LABUBUsecret #fake #LABUBUbigintoenergy #blindreact #latina #sandiego #fyp."[39]

74.    The TikTok user starts the video by showing a counterfeit version of the THE MONSTERS Big into Energy box, and saying "this is my first LABUBU box. I got it at 7-Eleven. I don't know if this is fake or not. It looks like the real deal, I'm not going to lie. But I don't know. I'm very oblivious."  A screenshot of the video is included below as **Figure 6**.

---

[39]  https://www.tiktok.com/@califroniahoney/video/7518466363183090974.

-53-

COMPLAINT



**Figure 6**

75.     The TikTok user opens the box, and pulls out a bag packaging and states: "You have to tell me if this is the real deal or not because I don't know. I cannot tell." She then says, "It has the 'POP MART' on it and everything," while pointing to a counterfeit version of one of the POP MART Marks. She continues to say, "Y'all are going to have to help me out." While continuing to look confused, the user says "Girl, I don't know. I have no idea." For the next minute of the video, she continues to study the product and express confusion.

76.     The final seconds of the video show a photograph of the counterfeit LABUBU doll she purchased with the text "its FAKE FR FR" across the photograph, a screenshot of which is included below as **Figure 7**.

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11



**Figure 7**

12    77.    As another example, on or around June 21, 2025, a TikTok user by the

13  name of "xashleycyanidex" posted a video on TikTok that was approximately 16

14  seconds long with the caption "Grabbed a labubu at 7-eleven 😂 was this a labubu or

15  a lafufu? Either way it's so cute #fyp #labubu #lafufu #popmart @POP MART US."[40]

16  A screenshot of the video is included as **Figure 8**.  The caption demonstrates the

17  poster's confusion as to whether the product is a genuine LABUBU or a "Lafufu."

18
19
20
21
22
23
24
25
26
27
28

---

[40]  https://www.tiktok.com/@xashleycyanidex/video/7518225535978327310.

-55-



**Figure 8**

78.     The social media posts described *supra*, among others, demonstrate that the 7-Eleven Counterfeit Products have caused actual confusion with genuine POP MART Products in the marketplace.

## **7-Eleven is Selling Counterfeit Products in Other States**

79.     In addition, social media posts show that 7-Eleven is selling 7-Eleven Counterfeit Products across the United States, including in Florida and Texas, and internationally.

80.     For example, on May 23, 2025, an Instagram user, "queenconniebonnie," posted a video, or Reel, of a 7-Eleven location in Fort Lauderdale, Florida, with the caption "If you're hunting for Labubu's in Miami there is a 711 that has AUTHENTIC labubu's we verified & she only buys legit …She will have Big into Energy ! . . . The shipment is on the way she has boxes secured ! She will announce when they're in the country They are between $34.99-$70 for labubu blind boxes . . . Address is 2920 E Sunrise Bld For Lauderdale[.]"  The video showed

the Instagram user purchasing 7-Eleven Counterfeit Products, which were kept behind the cashier counter.[41]   A screenshot of the video is depicted below as **Figure 9**.



**Figure 9**

81.    In Texas, on June 14, 2025 a Facebook user, "Harman Singh," posted to a Community page for the city of Manor, Texas, a photo of Counterfeit Products at a 7-Eleven location, with the caption: "Now available at 7-Eleven – 11209 US-290, Manor, TX[.]   Only $19.99 – 6 fun designs to collect!   Get yours before they're gone!"[42] A screenshot of the post is depicted below as **Figure 10**.

---

[41]   https://www.instagram.com/reel/DJ_ykH0Rjr6/?igsh=MXNoeG5lZGpxczR4bQ==.

[42]   https://www.facebook.com/groups/manorcommunitycircle/permalink/2644906115713909/?mibextid=wwXIfr&rdid=i4ljUnDhBxLPuDqS&share_url=https%3A%2F%2Fwww.facebook.com%2Fshare%2Fp%2F1EazdNkBq2%2F%3Fmibextid%3DwwXIfr#.

**Figure 10**

**The 7-Eleven Barstow Store**

82.    The 7-Eleven Barstow Store has displayed, offered, and sold 7-Eleven Counterfeit Products.  POP MART has confirmed at least three separate instances of the 7-Eleven Barstow Store selling 7-Eleven Counterfeit Products.

83.    On or about June 23, 2025, a TikTok user by the name of "travelwithjas" posted a video on TikTok that was approximately 55 seconds long on TikTok with the caption "@7-ELEVEN in Barstow was like I wanna make some extra money too #labubu    #labubuthemonsters    #labubuclothes    #sonnyangel    #sonnyangeltok #collectortok #711 #makemefamous #fyp #barstow #gasstation #californiatiktok #california."[43]

84.    The video begins with footage of the outside of the building of the 7-Eleven Barstow Store.  The front door of the store has three posters which prominently

---

[43]  https://www.tiktok.com/@travelwithjas/video/7519322156119919927.

display the text "LABUBU" with images of the LABUBU dolls, a screenshot of which is included below as **Figure 11**.



**Figure 11**

85.    In the video, the user states "Hey y'all. So we made it to the gas station at 7-Eleven in Barstow and they selling Labubu here, so let's go check it out. Because yeah I'm kind of confused."

86.    After entering the store, the user locates an end-cap display of 7-Eleven Counterfeit Products and says "so yeah, they got all the Labubus in here."  Her video shows at least five shelves filled with 7-Eleven Counterfeit Products, a screenshot of which is included below as **Figure 12**.

1
2
3
4
5
6
7
8
9
10
11
12



**Figure 12**

13

14    87.    On June 25, 2025, an individual visited the 7-Eleven Barstow store. She

15    saw the same three posters advertising LABUBU dolls referenced in the social media

16    post described above on the front door of the store. The individual also observed

17    merchandise being offered for sale that purported to be POP MART products.

18    Specifically, she saw the same end-cap display shown in the social media post

19    described above. There were three large posters which prominently display the text

20    "LABUBU" with images of the LABUBU dolls on top of the end-cap display. The

21    fourth shelf previously containing the counterfeit Big into Energy LABUBU packages

22    was empty, suggesting that this product was sold out. A photograph of the end-cap

23    display at the 7-Eleven Barstow store is included below as **Figure 13**.

24
25
26
27
28



**Figure 13**

88.     The individual purchased two items: (1) one box with the label "Exciting Macaron" ("7-Eleven Barstow Store Item 1"); and (2) one box with the label "Have A Seat LABUBU" ("7-Eleven Barstow Store Item 2").  Photographs of the purchased items are included in **Table I** below.

| Table I: Photographs of Counterfeit Items Purchased at the 7-Eleven Barstow Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
| 7-Eleven Barstow Store Item 1 Box | 7-Eleven Barstow Store Item 1 Bag | 7-Eleven Barstow Store Item 1 Doll |

| Table I: Photographs of Counterfeit Items Purchased at the 7-Eleven Barstow Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
| | [Not applicable] | |
| 7-Eleven Barstow Store Item 2 Box | 7-Eleven Barstow Store Item 2 Bag | 7-Eleven Barstow Store Item 2 Doll |

89.    The individual obtained a paper receipt for the purchase, which is included below as **Figure 14**.



**Figure 14**

COMPLAINT

90.    The receipt showed (1) 1 "Have a Sonny Toy" for $19.99 and (2) 1 "Lag Labubu Toy" for $24.99.

91.    On June 29, 2025, an individual visited the 7-Eleven Barstow store.  He observed a total of seven posters featuring LABUBU character artwork on the front door of the store, demonstrating that new posters were added to the front door within a week.  A photograph of the front door is included below as **Figure 15**.



**Figure 15**

92.    He also observed posters which prominently display the text "LABUBU" with images of the LABUBU dolls in the front and side display windows of the store.  A photograph of the outside of the store is included below as **Figure 16,**

with the aforementioned posters circled in red. A photograph of the side display window is included below as **Figure 17**.



**Figure 16**



**Figure 17**

COMPLAINT

93.     The individual purchased one relevant item—one box with the label "LABUBU 3.0" ("7-Eleven Barstow Store Item 3"). Photographs of the purchased items are included in **Table J** below.

| Table J: Photographs of Counterfeit Items Purchased at the 7-Eleven Barstow Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
| 7-Eleven Barstow Store Item 3 Box | 7-Eleven Barstow Store Item 3 Bag | 7-Eleven Barstow Store Item 3 Doll |

94.     He obtained a paper receipt for the purchase, which is included below as **Figure 18**.



**Figure 18**

95.    The receipt showed two "Lag Labubu Toy[s]" for $49.98, and a checkout bag charge.

96.    When the individual was purchasing the products, another customer asked the 7-Eleven clerk whether the 7-Eleven Counterfeit Products they were selling were real.  The clerk responded that the products were real. The individual then witnessed the other customer purchase 7-Eleven Counterfeit Products.

### The 7-Eleven Flintridge Store

97.    The 7-Eleven Flintridge Store has displayed, offered and sold 7-Eleven Counterfeit Products for sale.  POP MART has confirmed at least two separate instances of the 7-Eleven Flintridge Store selling 7-Eleven Counterfeit Products.

98.    On June 10, 2025, a POP MART customer submitted a Customer Support chat message via the POP MART website, writing that "today I went to a local 7-11 store where I saw this, store owners said yes there real but when scanning it lead to nothing Store location is 1535 Foothill Blvd La Cañada Flintridge, California 91011."  He submitted a photograph with the complaint, which is included below as **Figure 19**.



**Figure 19**

99.     On June 25, 2025, an individual visited the 7-Eleven Flintridge Store. He observed merchandise being offered for sale that purported to be POP MART products.

100.    Upon entry, the individual spotted what appeared to be LABUBU products on a four-shelf rolling cart's top shelf—"Exciting Macaron" varieties in a "Have A Seat" tray and a pink "Collect them all. Labubu characters" tray. Additional similar products were displayed at the checkout counter near the register.

101.    The individual purchased two items: (1) one box with the label "Exciting Macaron" ("7-Eleven Flintridge Store Item 1"); and (2) one box with the label "Have A Seat LABUBU" ("7-Eleven Flintridge Store Item 2").    Photographs of the purchased items are included in **Table K** below.

| Table K: Photographs of Counterfeit Items Purchased at the 7-Eleven Flintridge Store | | |
| --- | --- | --- |
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
|  |  |  |
| 7-Eleven Flintridge Store Item 1 Box | 7-Eleven Flintridge Store Item 1 Bag | 7-Eleven Flintridge Store Item 1 Doll |

| Table K: Photographs of Counterfeit Items Purchased at the 7-Eleven Flintridge Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
| 7-Eleven Flintridge Store Item 2 Box | 7-Eleven Flintridge Store Item 2 Bag | 7-Eleven Flintridge Store Item 2 Doll |

102.    The individual obtained a paper receipt for the purchase of the 7-Eleven Counterfeit Products, which is included below as **Figure 20.**



**Figure 20**

COMPLAINT

103.   The receipt showed (1) 1 "TY Squissh 14" NCI" for $9.99; and (2) 1 "Labubu" for $19.99, along with the checkout bag charge.

104.   The individual asked the male 7-Eleven employee working at the store whether the store will be getting any additional LABUBU products, and the employee responded that the store is expecting another shipment on the same day.   The individual also asked the male 7-Eleven employee whether the store was a franchise store or a 7-Eleven corporate store; the employee responded that it was a corporate store.

### **The 7-Eleven Glendale Store**

105.   The 7-Eleven Glendale Store has displayed, offered and sold 7-Eleven Counterfeit Products.  POP MART has confirmed at least two separate instances of the 7-Eleven Glendale Store selling 7-Eleven Counterfeit Products.

106.   On June 21, 2025, around 6:30 a.m. Pacific time, an individual visited the 7-Eleven Glendale Store and asked the clerk whether the store sold LABUBU dolls.   The clerk confirmed and pointed to an empty, counterfeit version of the Exciting Macaron tray, photographs of which are included below as **Figure 21** and **Figure 22**.


**Figure 21**


**Figure 22**

107.   The clerk produced a counterfeit version of the Exciting Macaron box from behind the counter, a photograph of which is included below as **Figure 23**.



**Figure 23**

108.   The individual purchased one product ("7-Eleven Glendale Store Item 1") and a cup for $26.28.   He obtained a paper receipt for the purchase, which is included below as **Figure 24.**

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



**Figure 24**

13    109.    Photographs of the purchased item are included in **Table L** below.

| Table L: Photographs of Counterfeit Items Purchased at the 7-Eleven Glendale Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
| 7-Eleven Glendale Store Item 1 Box | 7-Eleven Glendale Store Item 1 Bag | 7-Eleven Glendale Store Item 1 Doll |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

110.   On June 24, 2025, around 3:30 p.m. Pacific Time, an individual visited the 7-Eleven Glendale Store and saw what appeared to be LABUBU dolls displayed on a metal rack, a photograph of which is included below as **Figure 25**.  This batch differed from the one observed on June 21, 2025.



**Figure 25**

111.   On June 25, 2025, the individual visited the 7-Eleven Glendale Store again and purchased one "Big into Energy" product ("7-Eleven Glendale Store Item 2"), one "Exciting Macaron" product ("7-Eleven Glendale Store Item 3"), and one "Zimomo" product ("7-Eleven Glendale Store Item 4").   He then purchased an additional "Exciting Macaron" product ("7-Eleven Glendale Store Item 5"). Photographs of both receipts are shown in **Figure 26** and **Figure 27**.



**Figure 26**



**Figure 27**

112.  Photographs of the purchased items are included in **Table M** below.

| Table M: Photographs of Counterfeit Items Purchased at the 7-Eleven Glendale Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
| 7-Eleven Glendale Store Item 2 Box | 7-Eleven Glendale Store Item 2 Bag | 7-Eleven Glendale Store Item 2 Doll |

| Table M: Photographs of Counterfeit Items Purchased at the 7-Eleven Glendale Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
|  7-Eleven Glendale Store Item 3 Box |  7-Eleven Glendale Store Item 3 Bag |  7-Eleven Glendale Store Item 3 Doll |
|  7-Eleven Glendale Store Item 4 Box |  7-Eleven Glendale Store Item 4 Bag |  7-Eleven Glendale Store Item 4 Doll |

| Table M: Photographs of Counterfeit Items Purchased at the 7-Eleven Glendale Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
|  |  |  |
| 7-Eleven Glendale Store Item 5 Box | 7-Eleven Glendale Store Item 5 Bag | 7-Eleven Glendale Store Item 5 Doll |

### **The 7-Eleven Los Angeles Store**

113.   The 7-Eleven Los Angeles Store has displayed, offered and sold 7-Eleven Counterfeit Products.  POP MART has confirmed at least one instance of the 7-Eleven Los Angeles Store selling 7-Eleven Counterfeit Products.

114.   On June 25, 2025, an individual visited the 7-Eleven Los Angeles Store. He observed merchandise being offered for sale that purported to be POP MART products.

115.   The individual purchased three items: (1) one bag with the label "Labubu" ("7-Eleven Los Angeles Store Item 1"); (2) one small box with the label "KS" and characters in Mandarin ("7-Eleven Los Angeles Store Item 2"); and (3) one small hexagonal box with the label "SQany Aogel" ("7-Eleven Los Angeles Store Item 3").  Photographs of the purchased items are included in **Table N** below.

| Table N: Photographs of Counterfeit Items Purchased at the 7-Eleven Los Angeles Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Toy** |
| [Not Applicable] |  7-Eleven Los Angeles Store Item 1 Bag |  7-Eleven Los Angeles Store Item 1 Doll |
|  7-Eleven Los Angeles Store Item 2 Box |  7-Eleven Los Angeles Store Item 2 Bag |  7-Eleven Los Angeles Store Item 2 Doll |

| Table N: Photographs of Counterfeit Items Purchased at the 7-Eleven Los Angeles Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Toy** |
| 7-Eleven Los Angeles Store Item 3 Box | 7-Eleven Los Angeles Store Item 3 Bag | 7-Eleven Los Angeles Store Item 3 Doll |

116.    The individual purchased a total of three products for $23.01.    He obtained a paper receipt for the purchase, which is included below as **Figure 28**.



**Figure 28**

## The 7-Eleven Modesto Store

117.    The 7-Eleven Modesto Store has displayed, offered and sold 7-Eleven Counterfeit Products. POP MART has confirmed at least one instance of the 7-Eleven Modesto Store selling 7-Eleven Counterfeit Products.

118.    On June 24, 2025, an individual visited the 7-Eleven Modesto Store. He observed merchandise being offered for sale that purported to be POP MART products.

119.    The individual purchased one item—a box with the label "Big into Energy" ("7-Eleven Modesto Store Item 1"). Photographs of the purchased item are included in **Table O** below.

| Table O: Photographs of Counterfeit Items Purchased at the 7-Eleven Modesto Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
|  |  |  |
| 7-Eleven Modesto Store Item 1 Box | 7-Eleven Modesto Store Item 1 Bag | 7-Eleven Modesto Store Item 1 Doll |

120.    The individual purchased a total of one product for $21.99. He obtained a paper receipt for the purchase, which is included below as **Figure 29**. The receipt showed one "LB Big Into Energy" product for $21.99.

**Figure 29**

**<u>The 7-Eleven San Diego Store</u>**

121.    The 7-Eleven San Diego Store has displayed, offered and sold 7-Eleven Counterfeit Products.  POP MART has confirmed at least one instance of the 7-Eleven San Diego Store selling 7-Eleven Counterfeit Products.

122.    On June 24, 2025, an individual visited the 7-Eleven San Diego Store. He asked a female employee whether the store carried LABUBU products.  The employee led him to an alcohol display on the counter, which contained a box with the label "Have A Seat LABUBU," a photograph of which is included as **Figure 30** below.

1
2
3
4
5
6
7
8
9
10
11
12



**Figure 30**

13    123.    The individual asked if the store carried another type of LABUBU doll,

14 and the employee said that it did not, but that she could take his contact information

15 to let him know when the product was available.  The individual then asked how often

16 the store receives shipments of LABUBU products, and the employee said once a

17 month.

18    124.    The individual purchased one relevant item—a box with the label "Have

19 A Seat LABUBU" ("7-Eleven San Diego Store Item 1").  Photographs of the

20 purchased item are included in **Table P** below.

21
22
23
24
25
26
27
28

| Table P: Photographs of Counterfeit Items Purchased at the 7-Eleven San Diego Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
|  |  |  |
| 7-Eleven San Diego Store Item 1 Box | 7-Eleven San Diego Store Item 1 Bag | 7-Eleven San Diego Store Item 1 Doll |

125. The individual purchased a total of three products for $52.27. He obtained a paper receipt for the purchase, which is included below as **Figure 31**. The receipt showed one "Have a seat la bu bu" for $24.99, along with 1 "Stitch toy" for $24.99 and 1 "Double Wall Thermo CupSell12oz" for $2.29.

1



**Figure 31**

**<u>The 7-Eleven Simi Valley Store</u>**

126.   The 7-Eleven Simi Valley Store has displayed, offered and sold 7-Eleven Counterfeit Products.  POP MART has confirmed at least one instance of the 7-Eleven Simi Valley Store selling 7-Eleven Counterfeit Products.

127.   On or about June 21, 2025, a TikTok user by the name of "sarahellensmithh" posted a video on TikTok that was approximately 49 seconds long with the caption "@7-ELEVEN y'all get these people to give me my money back I'm being a full Karen but I'm legit upset over this #7eleven #fakelabubu #lafufu #fyp #foryou #foryoupage #california #californialaw #fraud."[44]  She tagged the official 7-Eleven TikTok account in the caption as depicted by the "@7-ELEVEN" text in the caption.  The video begins with footage of the outside of the 7-Eleven Simi Valley Store with the text "TAG 711 IN THE COMMENTS" and the user saying "This 7-Eleven is selling fake Labubus."  A screenshot of the post is included below as **Figure 32**.  The user continues to say "I

---

[44]   https://www.tiktok.com/@sarahellensmithh/video/7518268706925907231.

need to know what the laws are about selling fake Labubus um because this 7-Eleven in Simi Valley will not return it."



**Figure 32**

128.   Other TikTok users responded to the post, tagging the official 7-Eleven TikTok account.

129.   On June 24, 2025, an individual visited the 7-Eleven Simi Valley Store. An individual observed merchandise being offered for sale that purported to be POP MART products.

130.   The individual purchased five items: (1) one box with the label "Exciting Macaron" ("7-Eleven Simi Valley Store Item 1"); (2) one clear coin purse with a picture of a LABUBU doll; ("7-Eleven Simi Valley Store Item 2"); (3) one box with the label "Have A Seat" ("7-Eleven Simi Valley Store Item 3"); (4) one box with the label "LABUBU 3.0" ("7-Eleven Simi Valley Store Item 4"); and (5) one box with

the label "Big into Energy" ("7-Eleven Simi Valley Store Item 5").  Photographs of the purchased items are included in **Table Q** below.

| Table Q: Photographs of Counterfeit Items Purchased at the 7-Eleven Simi Valley Store | | |
| --- | --- | --- |
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
|  7-Eleven Simi Valley Store Item 1 Box |  7-Eleven Simi Valley Store Item 1 Bag |  7-Eleven Simi Valley Store Item 1 Doll |
| [Not Applicable] | [Not Applicable] |  7-Eleven Simi Valley Store Item 2 Doll |

| Table Q: Photographs of Counterfeit Items Purchased at the 7-Eleven Simi Valley Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
|  7-Eleven Simi Valley Store Item 3 Box |  7-Eleven Simi Valley Store Item 3 Bag |  7-Eleven Simi Valley Store Item 3 Doll |
|  7-Eleven Simi Valley Store Item 4 Box |  7-Eleven Simi Valley Store Item 4 Bag |  7-Eleven Simi Valley Store Item 4 Doll |

| Table Q: Photographs of Counterfeit Items Purchased at the 7-Eleven Simi Valley Store | | |
|---|---|---|
| **Photograph of Box** | **Photograph of Bag** | **Photograph of Vinyl Plush Toy** |
|  |  |  |
| 7-Eleven Simi Valley Store Item 5 Box | 7-Eleven Simi Valley Store Item 5 Bag | 7-Eleven Simi Valley Store Item 5 Doll |

131.   The total for the five products was $92.18.  The individual obtained a paper receipt for the purchase, which is included below as **Figure 33.** The receipt showed (1) two "BIGINTO ENERGY" products for $39.98, (2) two "HAVE A seat" products for $39.98, and a "Groc Tax F" charge for $5.99.

**Figure 33**

**The 7-Eleven Counterfeit Products**

132.    The 7-Eleven Counterfeit Products displayed, offered and sold by Defendants include, but are not necessarily limited to, the products depicted in **Tables I-Q** above.    **Table R** below includes some examples of the 7-Eleven Counterfeit Products side-by-side with genuine POP MART products and packaging, showing they bear the same or confusingly similar marks and trade dress.

| Table R: Sample Comparisons of POP MART's Genuine Products and 7-Eleven Counterfeit Products | |
|---|---|
| **POP MART's Genuine Product** | **7-Eleven's Counterfeit Product** |
| THE MONSTERS Exciting Macaron Series | |
|  POP MART Genuine Exciting Macaron Box |  7-Eleven Glendale Store Item 5 Box |
|  POP MART Genuine Exciting Macaron Bag |  7-Eleven Simi Valley Store Item 1 Bag |

| Table R: Sample Comparisons of POP MART's Genuine Products and 7-Eleven Counterfeit Products ||
|---|---|
| **POP MART's Genuine Product** | **7-Eleven's Counterfeit Product** |
|  POP MART Genuine Exciting Macaron Doll |  7-Eleven Simi Valley Store Item 1 Doll |
| **THE MONSTERS Have A Seat Series** ||
|  POP MART Genuine Have A Seat Box |  7-Eleven Flintridge Store Item 1 Box |

| Table R: Sample Comparisons of POP MART's Genuine Products and 7-Eleven Counterfeit Products ||
|---|---|
| **POP MART's Genuine Product** | **7-Eleven's Counterfeit Product** |
|  POP MART Genuine Have A Seat Bag |  7-Eleven Flintridge Store Item 1 Bag |
|  POP MART Genuine Have A Seat Doll |  7-Eleven Flintridge Store Item 1 Doll |

| Table R: Sample Comparisons of POP MART's Genuine Products and 7-Eleven Counterfeit Products | |
|---|---|
| **POP MART's Genuine Product** | **7-Eleven's Counterfeit Product** |
| THE MONSTERS Big into Energy Series | |
|  POP MART Genuine Big into Energy Box |  7-Eleven Modesto Store Item 1 Box |
|  POP MART Genuine Big into Energy Bag |  7-Eleven Modesto Store Item 1 Bag |

| Table R: Sample Comparisons of POP MART's Genuine Products and 7-Eleven Counterfeit Products | |
|---|---|
| **POP MART's Genuine Product** | **7-Eleven's Counterfeit Product** |
|  |  |
| POP MART Genuine Big into Energy Doll | 7-Eleven Modesto Store Item 1 Doll |

133.    **Table S** below includes examples of 7-Eleven Counterfeit Products that use POP MART Registered Marks.

| Table S: Examples of Counterfeit Items Using POP MART Registered Marks | |
|---|---|
| **POP MART Registered Marks** | **Examples of 7-Eleven's Counterfeit Product** |
| POP MART Trademark Registration No. 6592820<br><br>**POP MART** | 7-Eleven Simi Valley Store<br>Item 1 Box |


7-Eleven Modesto Store
Item 1 Box

| Table S: Examples of Counterfeit Items Using POP MART Registered Marks | |
|---|---|
| **POP MART Registered Marks** | **Examples of 7-Eleven's Counterfeit Product** |
| LABUBU Trademark Registration No. 7839144<br><br>**LABUBU** |  <br>7-Eleven Flintridge Store Item 1 Box | <br>7-Eleven Barstow Store<br>Item 3 Box |
| THE MONSTERS Trademark Registration No. 7839156<br><br> | <br>7-Eleven Simi Valley Store Item 1 Bag | <br>7-Eleven Glendale Store Item 5 Box |

134.    **Table T** below includes some examples of 7-Eleven Counterfeit Products that infringe the LABUBU Trade Dress.

| Table T: Examples of 7-Eleven Counterfeit Products Using POP MART's LABUBU Trade Dress | |
|---|---|
| **POP MART's Genuine Product** | **7-Eleven's Counterfeit Product** |
|  POP MART Genuine Exciting Macaron Doll - Green Grape |  7-Eleven Simi Valley Store Item 1 Doll |
|  POP MART Genuine Exciting Macaron Doll - Sesame Bean |  7-Eleven Glendale Store Item 5 Doll |

| Table T: Examples of 7-Eleven Counterfeit Products Using POP MART's LABUBU Trade Dress | |
|---|---|
| **POP MART's Genuine Product** | **7-Eleven's Counterfeit Product** |
| <br>POP MART Genuine Have A Seat Doll - BABA | <br>7-Eleven Simi Valley Store Item 3 Doll |
| <br>POP MART Genuine Have A Seat Doll - DADA | <br>7-Eleven San Diego Store Item 1 Doll |

| Table T: Examples of 7-Eleven Counterfeit Products Using POP MART's LABUBU Trade Dress | |
|---|---|
| **POP MART's Genuine Product** | **7-Eleven's Counterfeit Product** |
|  POP MART Genuine Big into Energy Doll - HOPE |  7-Eleven Simi Valley Store Item 5 Doll |
|  POP MART Genuine Have A Seat Doll - QUQU |  7-Eleven Flintridge Store Item 1 Doll |

| Table T: Examples of 7-Eleven Counterfeit Products Using POP MART's LABUBU Trade Dress ||
|---|---|
| **POP MART's Genuine Product** | **7-Eleven's Counterfeit Product** |
|  |  |
| POP MART Genuine Big into Energy Doll- LOVE | 7-Eleven Modesto Store Item 1 Doll |
|  |  |
| POP MART Genuine Big into Energy Doll - LOYALTY | 7-Eleven Glendale Store Item 2 Doll |

135.   **Table U** below includes examples of 7-Eleven Counterfeit Products that copy and otherwise infringe the POP MART Copyrighted Works.

| Table U: Examples of Infringement of POP MART Copyrighted Works | |
| --- | --- |
| **POP MART Copyrighted Works** | **7-Eleven's Counterfeit Product** |
| <br><br>Copyright Registration No. VA0002424793<br>Have a Seat Bag | <br><br>7-Eleven Flintridge Store<br>Item 1 Bag |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Table U: Examples of Infringement of POP MART Copyrighted Works | |
|---|---|
| **POP MART Copyrighted Works** | **7-Eleven's Counterfeit Product** |
|  |  |
| Copyright Registration No. VA0002448371 THE MONSTERS Big into Energy Series-Vinyl Plush Pendant Blind Box-LOVE | 7-Eleven Modesto Store Item 1 Doll |

| Table U: Examples of Infringement of POP MART Copyrighted Works | |
| --- | --- |
| **POP MART Copyrighted Works** | **7-Eleven's Counterfeit Product** |
| <br><br>THE MONSTERS - ANGEL IN CLOUDS<br>Vinyl Face Doll<br>Copyright Registration No.<br>VA0002448155 | <br>7-Eleven Glendale Store<br>Item 4 Box<br><br><br>7-Eleven Glendale Store<br>Item 4 Doll |

| Table U: Examples of Infringement of POP MART Copyrighted Works | |
| --- | --- |
| **POP MART Copyrighted Works** | **7-Eleven's Counterfeit Product** |
| <br><br>Copyright Registration No. VA0002451895<br>THE MONSTERS - Exciting Macaron Vinyl Face Blind Box-Chestnut Cocoa | <br><br>7-Eleven Simi Valley Store Item 1 Doll |
| <br><br>Copyright Registration No. VA0002451935<br>THE MONSTERS - Have a Seat Vinyl Plush Blind Box-DUODUO | <br><br>7-Eleven Flintridge Store Item 1 Doll |

| Table U: Examples of Infringement of POP MART Copyrighted Works ||
| POP MART Copyrighted Works | 7-Eleven's Counterfeit Product |
|---|---|
| <br>Copyright Registration No.<br>VA0002451927<br>THE MONSTERS - Have a Seat Vinyl<br>Plush Blind Box-HEHE | <br>7-Eleven Flintridge<br>Store Item 2 Doll |
| <br>Copyright Registration No.<br>VA0002452119<br>THE MONSTERS Big into Energy Series-<br>Boxes | <br>7-Eleven Glendale Store<br>Item 2 Box |

| Table U: Examples of Infringement of POP MART Copyrighted Works ||
|---|---|
| **POP MART Copyrighted Works** | **7-Eleven's Counterfeit Product** |
|  Copyright Registration No. VA0002452126 THE MONSTERS Big into Energy Series- Packing Bags |  7-Eleven Glendale Store Item 2 Bag |
|  Copyright Registration No. VA0002452124 THE MONSTERS - Exciting Macaron - Boxes |  7-Eleven Glendale Store Item 5 Box |

| Table U: Examples of Infringement of POP MART Copyrighted Works ||
| POP MART Copyrighted Works | 7-Eleven's Counterfeit Product |
|  |  |
| Copyright Registration No. VA0002452141 THE MONSTERS - Exciting Macaron - Packing Bags | 7-Eleven Simi Valley Store Item 1 Bag |

136.  Defendants' sale of reproductions, counterfeits, copies and colorable imitations of the POP MART Marks (the "Counterfeit Marks") and the LABUBU Trade Dress (the "Counterfeit Trade Dress") has created a likelihood of confusion and mistake among consumers as to the source and origin of the 7-Eleven Counterfeit Products and as to POP MART's connection or affiliation with, or endorsement of, the 7-Eleven Counterfeit Products and 7-Eleven. Indeed, as shown above, Defendants' unlawful conduct has caused actual confusion among the consuming public as to the source and origin of the 7-Eleven Counterfeit Products and as to POP MART's connection or affiliation with, or endorsement of, the 7-Eleven Counterfeit Products and 7-Eleven.

137.  Defendants' infringement of the POP MART Marks and the LABUBU Trade Dress was and continues to be willful and intended to cause confusion or mistake among consumers for Defendants' benefit.  Defendants' acts in deceiving

customers into believing that POP MART products could be purchased at 7-Eleven stores is not an innocent coincidence: it is widespread among 7-Eleven stores and has occurred at the very same time that POP MART was seeing, and continues to see, record performance in sales of LABUBU Products. Defendants' sale of the 7-Eleven Counterfeit Products is a deliberate effort to trade on the popularity of the POP MART Marks and the LABUBU Trade Dress, which POP MART has achieved through substantial investment and innovation.

138.   Defendants' willfulness in infringing the POP MART Marks and the LABUBU Trade Dress is evident from its blatant copying of the POP MART Marks and other source-identifying features of popular LABUBU Products. For example, Defendants sell counterfeit products depicting the POP MART mark; and on some counterfeit products, they use a mark that says "ROR MART," as reflected in **Figure 34** below. POP MART does not brand any genuine products with this type of designation. Further, Defendants sell counterfeit products depicting the text "LABUBU" and the trademark for "THE MONSTERS," as reflected in **Table S** *supra*.



**Figure 34**

139.   Further confirming 7-Eleven's knowledge of sales of the 7-Eleven Counterfeit Products in 7-Eleven stores, POP MART has discovered a social media post from April 27, 2025, tagging 7-Eleven's official X account, in which a customer attached a photograph of an apparent 7-Eleven Counterfeit Product and stated; "I bought this counterfeit at a local @7eleven in Southern California.  How can I get this reported as a counterfeit product."[45]  Using its official X account, 7-Eleven replied the following day, April 28, 2025, and stated: "We're sorry to hear this!  Can you send us more details at bit.ly/ContactUs7Elev…?  We appreciate your feedback!"  The individual who made the original post replied, "I did you guys did not even wanted to give me my money back!"  A screenshot of the X post and 7-Eleven's comment in reply is included below as **Figure 35.**

---

[45]  https://x.com/DreamITcollects/status/1916527733884203390.

-107-

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



**Figure 35**

140.    The 7-Eleven Counterfeit Products are not licensed, authorized, sponsored, endorsed, or approved by POP MART in any way, for use by 7-Eleven, or by any suppliers of goods to 7-Eleven.

141.    POP MART used the POP MART Marks and the LABUBU Trade Dress extensively and continuously in commerce before Defendants began using confusingly similar imitations of POP MART's products.

142.    The goods sold by Defendants are similar to, and compete with, goods that POP MART sells and are sold through overlapping channels of trade.

143.   Defendants' use of identical and/or confusingly similar imitations of POP MART's LABUBU Products is likely to deceive, confuse, and mislead prospective purchasers into believing that products Defendants sell are manufactured by, authorized by, or in some manner associated with POP MART, when they are not. The likelihood of confusion, mistake, and deception engendered by Defendants' misappropriation of the POP MART Marks and the LABUBU Trade Dress is causing irreparable harm to the goodwill symbolized by the POP MART Marks and the LABUBU Trade Dress and the reputation for quality that they embody.

144.   Defendants' activity is likely to cause confusion, and has caused actual confusion, before, during, and after the time of purchase because purchasers, prospective purchasers, and others viewing Defendants' products at the point of sale or on a wearer are likely to mistakenly attribute the product to POP MART.  This is particularly damaging with respect to those persons who perceive a defect or lack of quality in Defendants' products.  By causing such a likelihood of confusion, mistake, and deception, Defendants are causing irreparable harm to the goodwill the POP MART Marks and the LABUBU Trade Dress symbolize, and the reputation for quality they embody.  Most counterfeit products are of poor quality, unsightly, and may even be disturbing to consumers (especially children).  This includes, but is not limited to the 7-Eleven Counterfeit Products having, for example, (1) eyes that have popped out or are poorly secured, creating a disturbing effect as well as an unsafe product; (2) substandard fur stitching with loose threads and uneven seams; (3) deformed, lopsided head shapes; (4) heads or hands that come off; and even (5) upside down faces.

145.   Further, Defendants' sales of 7-Eleven Counterfeit Products diverts revenue that would otherwise flow to POP MART.

146.   Defendants continue to use the Counterfeit Marks and the Counterfeit Trade Dress—which are confusingly similar imitations of the POP MART Marks and the LABUBU Trade Dress, respectively—in connection with the sale of products that

are directly competitive to those POP MART offers.  Defendants began selling these imitations well after POP MART established protectable rights to the POP MART Marks and the LABUBU Trade Dress, and well after the POP MART Marks and the LABUBU Trade Dress achieved their current levels of popularity and notoriety.

147.    Defendants knowingly, willfully, intentionally, and maliciously adopted and used confusingly similar imitations of the POP MART Marks and the LABUBU Trade Dress.

## FIRST CAUSE OF ACTION

### (Federal Trademark Counterfeiting – 15 U.S.C. § 1114)

### (By POP MART Singapore and POP Mart Beijing Against All Defendants)

148.    POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

149.    POP MART Singapore and POP MART Beijing own valid and registered United States Trademark Registrations from the United States Patent and Trademark Office for the POP MART Registered Marks, as set out above including in **Table F**.

150.    POP MART has continuously used the POP MART Registered Marks throughout the United States.

151.    Defendants use the Counterfeit Marks, which are non-genuine versions of the POP MART Registered Marks, that are identical to, or substantially indistinguishable from, the POP MART Registered Marks.

152.    Defendants are intentionally using the Counterfeit Marks to falsely suggest that Defendants' goods have been certified by POP MART.

153.    POP MART Singapore and POP MART Beijing did not authorize Defendants' use of the Counterfeit Marks, and such unauthorized use of the Counterfeit Marks is likely to confuse consumers into falsely believing that Defendants' goods are authorized or certified by POP MART when they are not.

154.    Defendants' use of the Counterfeit Marks without consent from POP MART Singapore and POP MART Beijing was and is a willful and intentional infringement of the POP MART Registered Marks.

155.    Defendants have profited from their acts of infringement.  POP MART Singapore and POP MART Beijing are entitled to recover Defendants' profits arising from the infringement, any damages sustained by them arising from said infringement, as well as the costs of this action.  POP MART Singapore and POP MART Beijing also are entitled to an enhanced award of profits and/or damages to fully and adequately compensate them for Defendants' infringement.  At its election, POP MART Singapore and POP MART Beijing are also entitled to statutory damages.  POP MART Singapore and POP MART Beijing therefore are entitled to injunctive relief and to Defendants' profits, actual damages, enhanced profits, and damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1114, 1116, and 1117.

156.    Defendants have caused and, unless enjoined by this Court, will continue to cause irreparable injury to POP MART Singapore and POP MART Beijing that is not fully compensable in monetary damages.  The damage to POP MART Singapore and POP MART Beijing includes harm to its goodwill and business reputation in the marketplace that money cannot compensate.  POP MART Singapore and POP MART Beijing are therefore entitled to a preliminary and permanent injunction enjoining and restraining Defendants from use of the Counterfeit Marks, the POP MART Registered Marks, or any other mark that is confusingly similar to the POP MART Registered Marks.

## SECOND CAUSE OF ACTION

### (Contributory Federal Trademark Counterfeiting – 15 U.S.C. § 1114)

### (By POP MART Singapore and POP Mart Beijing Against 7-Eleven)

157.    POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

158. POP MART Singapore and POP MART Beijing own valid and registered United States Trademark Registrations from the United States Patent and Trademark Office for the POP MART Registered Marks, as set out above including in **Table F**.

159. As detailed above, the 7-Eleven Stores sell goods bearing the Counterfeit Marks, which are non-genuine versions of the POP MART Registered Marks that are identical to, or substantially indistinguishable from, the POP MART Registered Marks. The foregoing activity, which is ongoing, constitutes direct trademark infringement in violation of 15 U.S.C. § 1114.

160. Defendant 7-Eleven is contributorily liable for these direct infringements by its franchise stores as described herein. 7-Eleven has actual knowledge or reason to know of the infringement, including because 7-Eleven (i) has or has access to receipts reflecting the 7-Eleven Counterfeit Products being sold at its stores; (ii) has inventory management systems and technology that identify and analyze merchandise being sold at 7-Eleven Stores; (iii) maintains control and/or approval over which categories of products, and specific products, franchise stores offer; and (iv) has and exercises the right to conduct audits of franchise stores, including of the products franchise stores offer. 7-Eleven's knowledge of 7-Eleven Counterfeit Products being sold in its stores is confirmed, *inter alia*, by its reply on the official 7-Eleven X account, to a report of such a product (including a photograph of it), to which it replied, "We're sorry to hear this!" and requesting further details. 7-Eleven has knowledge of and control over the merchandise sold in each 7-Eleven store, including franchise stores.

161. Nevertheless, 7-Eleven has failed to take reasonable measures to prevent the infringement, and in fact facilitates and encourages such infringement, including by supplying 7-Eleven Counterfeit Products to its stores and/or allowing its stores to obtain them, and by continuing to permit its stores to sell the 7-Eleven Counterfeit Products. 7-Eleven monitors its franchise stores' activities both via its sales and

inventory technology systems and via visits to its franchise stores and has the means to take simple steps to prevent the specific infringing activity but fails to do so.  Instead, 7-Eleven continues to permit its stores, including its franchisees, to sell the 7-Eleven Counterfeit Products, and actively facilitates the ongoing infringement.

162.   Accordingly, 7-Eleven is contributorily liable for the infringement of the POP MART Registered Marks.

163.   The foregoing acts of infringement by 7-Eleven have been willful, intentional, and purposeful, in disregard of POP MART Singapore and POP MART Beijing's rights.

164.   7-Eleven has profited from its acts of infringement.  POP MART Singapore and POP MART Beijing are entitled to recover 7-Eleven's profits arising from the infringement, any damages sustained by POP MART Singapore and POP MART Beijing arising from said infringement, as well as the costs of this action.  POP MART Singapore and POP MART Beijing also are entitled to an enhanced award of profits and/or damages to fully and adequately compensate them for 7-Eleven's infringement.  At their election, POP MART Singapore and POP MART Beijing are also entitled to statutory damages.  POP MART Singapore and POP MART Beijing therefore are entitled to injunctive relief and to 7-Eleven's profits, actual damages, enhanced profits, and damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1114, 1116, and 1117.

165.   7-Eleven has caused and, unless enjoined by this Court, will continue to cause irreparable injury to POP MART Singapore and POP MART Beijing that is not fully compensable in monetary damages.  The damage to POP MART Singapore and POP MART Beijing includes harm to their goodwill and business reputation in the marketplace that money cannot compensate.  POP MART Singapore and POP MART Beijing are therefore entitled to a preliminary and permanent injunction enjoining and restraining 7-Eleven from use of the Counterfeit Marks, the POP MART Registered

Marks, or any other mark that is confusingly similar to the POP MART Registered Marks.

### **THIRD CAUSE OF ACTION**

**(Vicarious Federal Trademark Counterfeiting – 15 U.S.C. § 1114)**

**(By POP MART Singapore & POP MART Beijing Against 7-Eleven)**

166.    POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

167.    POP MART Singapore and POP MART Beijing own valid and registered United States Trademark Registrations from the United States Patent and Trademark Office for the POP MART Registered Marks, as set out above including in **Table F**.

168.    As detailed above, the 7-Eleven Stores sell goods bearing the Counterfeit Marks, which are non-genuine versions of the POP MART Registered Marks that are identical to, or substantially indistinguishable from, the POP MART Registered Marks.    The foregoing activity, which is ongoing, constitutes direct trademark infringement in violation of 15 U.S.C. § 1114.

169.    Defendant 7-Eleven is vicariously liable for these direct infringements by its 7-Eleven Stores as described herein.    7-Eleven exerts significant control over the selection, distribution, placement, and sale of the 7-Eleven Counterfeit Products by the 7-Eleven Stores, and 7-Eleven and the 7-Eleven Stores have an apparent or actual partnership, have authority to bind one another in transactions with third parties, and/or exercise joint ownership or control over the 7-Eleven Counterfeit Products. Specifically, 7-Eleven (i) has or has access to records reflecting the 7-Eleven Counterfeit Products being sold at its stores; (ii) has inventory management systems and technology that tracks, identifies and analyzes merchandise being sold at 7-Eleven Stores, (iii) maintains control and/or approval over which categories of products, and specific products, franchise stores offer; and (iv) has and exercises the right to conduct audits of franchise stores, including of the products franchise stores

offer.  Despite exercising its right and ability to control by supervising the franchisee store's operations, including the sale of 7-Eleven Counterfeit Products, 7-Eleven failed to exercise this control to prevent and stop this infringement.

170.   7-Eleven has received direct financial benefit from the acts of infringement through its share of the revenue and profits gained from the 7-Eleven Stores' infringing sales, and additional competitive advantages gained by leveraging the popularity of the LABUBU Products to draw consumers to its stores to make additional purchases.

171.   Accordingly, 7-Eleven is vicariously liable for the infringement of the POP MART Registered Marks.

172.   7-Eleven has profited from its acts of infringement. POP MART Singapore and POP MART Beijing are entitled to recover 7-Eleven's profits arising from the infringement, any damages sustained by POP MART Singapore and POP MART Beijing arising from said infringement, as well as the costs of this action.  POP MART Singapore and POP MART Beijing also are entitled to an enhanced award of profits and/or damages to fully and adequately compensate them for 7-Eleven's infringement.  At their election, POP MART Singapore and POP MART Beijing  also are entitled to statutory damages.  POP MART Singapore and POP MART Beijing therefore are entitled to injunctive relief and to 7-Eleven's profits, actual damages, enhanced profits, and damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1114, 1116, and 1117.

173.   7-Eleven has caused and, unless enjoined by this Court, will continue to cause irreparable injury to POP MART Singapore and POP MART Beijing that is not fully compensable in monetary damages.  The damage to POP MART Singapore and POP MART Beijing includes harm to their goodwill and business reputation in the marketplace that money cannot compensate.  POP MART Singapore and POP MART Beijing are therefore entitled to a preliminary and permanent injunction enjoining and restraining 7-Eleven from use of the Counterfeit Marks, the POP MART Registered

Marks, or any other mark that is confusingly similar to the POP MART Registered Marks.

### **FOURTH CAUSE OF ACTION**

**(Federal Trademark Infringement – 15 U.S.C. § 1114)**

**(By POP MART Singapore & POP MART Beijing Against All Defendants)**

174.    POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

175.    POP MART Singapore and POP MART Beijing own valid and registered United States Trademark Registrations from the United States Patent and Trademark Office for the POP MART Registered Marks, as set out above including in **Table F**.

176.    Defendants are advertising and selling goods using Counterfeit Marks identical to or substantially indistinguishable from the POP MART Registered Marks in appearance, sound, meaning, and commercial impression, such that the use and registration thereof is likely to cause confusion, mistake, and deception as to the authorization and/or certification of Defendants' goods, and that the public is likely to be confused, deceived, and to assume erroneously that Defendants' goods have been certified by POP MART or that Defendants are in some way connected with, licensed, authorized, certified by, or affiliated with POP MART, and will irreparably injure and damage POP MART Singapore and POP MART Beijing and the goodwill and reputation symbolized by the POP MART Registered Marks.

177.    As the Counterfeit Marks used on Defendants' goods are identical to or substantially indistinguishable from the POP MART Registered Marks, the public is likely to be confused and deceived, and to assume erroneously that Defendants' goods have been certified by POP MART or that Defendants are in some way connected with, licensed, sponsored by, or affiliated with POP MART, all to POP MART Singapore and POP MART Beijing's irreparable damage.

178.   The likelihood of confusion is even greater because the POP MART Registered Marks are strong, widely recognized, and entitled to a broad scope of protection.

179.   Confusion is even more likely due to the fact that the Counterfeit Marks prominently incorporate the key components of the POP MART Registered Marks, including: (i) a square containing the stylized terms "POP MART" with "POP" appearing above "MART"; (ii) the stylized wording "POP MART" with a shaded rectangle; (iii) the characters "POP MART" without any particular font style, size, or color; (iv) the wording "THE MONSTERS" underneath a stylized silhouette of an elf lying down on the word "MONSTERS"; and (v) the characters "LABUBU" without any particular font style, size, or color.

180.   Defendants are not affiliated or connected with POP MART and have not been endorsed or sponsored by POP MART, nor has POP MART approved any of Defendants' goods offered or sold or intended to be sold by Defendants under the Counterfeit Marks.

181.   Defendants have never obtained the permission of POP MART Singapore and POP MART Beijing to use the Counterfeit Marks, nor has POP MART Singapore and POP MART Beijing certified any of Defendants' goods offered under Defendants' Counterfeit Marks.

182.   POP MART Singapore and POP MART Beijing's United States Trademark Registrations set out above provide, at the very least, constructive notice to Defendants of the rights of POP MART Singapore and POP MART Beijing in and to the POP MART Registered Marks.

183.   Defendants' use of the Counterfeit Marks in connection with the Defendants' 7-Eleven Counterfeit Products is likely to cause confusion, mistake, or deception of consumers as to the authorization or certification of the goods, in violation of the Lanham Act, including but not limited to 15 U.S.C. § 1114.

184.   Consumers are likely to purchase, and have purchased, Defendants' goods being offered under the Counterfeit Marks believing them to have been certified by POP MART Singapore and POP MART Beijing, thereby resulting in a loss of goodwill and economic harm to POP MART.

185.   Upon information and belief, Defendants intentionally adopted and use the Counterfeit Marks to create consumer confusion and traffic off of POP MART's reputation and goodwill under the POP MART Registered Marks.

186.   Upon information and belief, Defendants have derived unlawful gains and profits from their use of the Counterfeit Marks.

187.   The goodwill of POP MART's business under the POP MART Registered Marks is of great value, and POP MART Singapore and POP MART Beijing will suffer irreparable harm should Defendants' infringement be allowed to continue, to the detriment of the trade reputation and goodwill of POP MART Singapore and POP MART Beijing , for which damage they cannot be adequately compensated at law.

188.   POP MART Singapore and POP MART Beijing have no control over the quality of the goods offered by Defendants.  Thus, the great value of the POP MART Registered Marks is subject to damage by entities they cannot control.

189.   Unless Defendants are enjoined by this Court from so doing, POP MART Singapore and POP MART Beijing will continue to suffer irreparable harm and injury to their goodwill and reputation.

190.   Upon information and belief, Defendants have engaged in acts of infringement, with knowledge of POP MART Singapore and POP MART Beijing's exclusive rights in and to the POP MART Registered Marks, and Defendants continue in such acts of intentional infringement, thus entitling POP MART Singapore and POP MART Beijing to an award of treble damages, disgorgement of Defendants' profits, and attorneys' fees and costs in bringing and maintaining this action, pursuant to 15 U.S.C. § 1117.

191.    Defendants have caused and, unless enjoined by this Court, will continue to cause irreparable injury to POP MART Singapore and POP MART Beijing that is not fully compensable in monetary damages.  POP MART Singapore and POP MART Beijing are therefore entitled to a preliminary and permanent injunction enjoining and restraining Defendants from use of the Counterfeit Marks, the POP MART Registered Marks, or any other mark that is confusingly similar to the POP MART Registered Marks.

## FIFTH CAUSE OF ACTION

**(Contributory Federal Trademark Infringement – 15 U.S.C. § 1114)**

**(By POP MART Singapore and POP MART Beijing Against 7-Eleven)**

192.    POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

193.    POP MART Singapore and POP MART Beijing own valid and registered United States Trademark Registrations from the United States Patent and Trademark Office for the POP Registered MART Marks, as set out above including in **Table F**.

194.    As detailed above, the 7-Eleven Stores sell goods bearing the Counterfeit Marks, which are non-genuine versions of the POP MART Registered Marks that are identical to, or substantially indistinguishable from, the POP MART Registered Marks.    The foregoing activity, which is ongoing, constitutes direct trademark infringement in violation of 15 U.S.C. § 1114.

195.    Defendant 7-Eleven is contributorily liable for these direct infringements by its 7-Eleven Stores as described herein.  7-Eleven has actual knowledge or reason to know of the infringement, including because 7-Eleven (i) has or has access to receipts reflecting the 7-Eleven Counterfeit Products being sold at its stores; (ii) has inventory management systems and technology that identify and analyze merchandise being sold at 7-Eleven stores; (iii) maintains control and/or approval over which categories of products, and specific products, the 7-Eleven Stores offer; and (iv) has

and exercises the right to conduct audits of the 7-Eleven Stores, including of the products the 7-Eleven Stores offer. 7-Eleven's knowledge of 7-Eleven Counterfeit Products being sold in its stores is confirmed, *inter alia*, by its reply on the official 7-Eleven X account, to a report of such a product (including a photograph of it), to which it replied "We're sorry to hear this!" and requesting further details. 7-Eleven has knowledge of and control over the merchandise sold in each 7-Eleven store, including 7-Eleven Stores.

196. Nevertheless, 7-Eleven has failed to take reasonable measures to prevent the infringement, and in fact facilitates and encourages such infringement, including by supplying 7-Eleven Counterfeit Products to its stores and/or allowing its stores to obtain them, and by continuing to permit its stores to sell the 7-Eleven Counterfeit Products. 7-Eleven monitors its 7-Eleven Stores' activities both via its sales and inventory technology systems and via visits to its 7-Eleven Stores, and has the means to take simple steps to prevent the specific infringing activity but fails to do so. Instead, 7-Eleven continues to permit its stores, including its franchisees, to sell the 7-Eleven Counterfeit Products, and actively facilitates the ongoing infringement.

197. Accordingly, 7-Eleven is contributorily liable for the infringement of the POP MART Registered Marks.

198. The foregoing acts of infringement by 7-Eleven have been willful, intentional, and purposeful, in disregard of POP MART Singapore and POP MART Beijing's rights.

199. Unless 7-Eleven is enjoined by this Court from so doing, POP MART Singapore and POP MART Beijing will continue to suffer irreparable harm and injury to its goodwill and reputation.

200. Upon information and belief, 7-Eleven has engaged in acts of infringement, with knowledge of POP MART Singapore and POP MART Beijing's exclusive rights in and to the POP MART Registered Marks, and 7-Eleven continues in such acts of intentional infringement, thus entitling POP MART Singapore and

POP MART Beijing to an award of treble damages, disgorgement of 7-Eleven's profits, and attorneys' fees and costs in bringing and maintaining this action, pursuant to 15 U.S.C. § 1117.

**SIXTH CAUSE OF ACTION**

**(Vicarious Federal Trademark Infringement – 15 U.S.C. § 1114)**

**(By POP MART Singapore and POP MART Beijing Against 7-Eleven)**

201.   POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

202.   POP MART Singapore and POP MART Beijing own valid and registered United States Trademark Registrations from the United States Patent and Trademark Office for the POP MART Registered Marks, as set out above including in **Table F**.

203.   As set forth above, the 7-Eleven Stores' use of the Counterfeit Marks in connection with the sale of Defendants' goods is likely to cause confusion, mistake, or deception of consumers as to the authorization or certification of the goods, in violation of the Lanham Act, including but not limited to 15 U.S.C. § 1114.

204.   7-Eleven is vicariously liable for these direct infringements by its 7-Eleven Stores as described herein.  7-Eleven exerts significant control over the selection, distribution, placement, and sale of the 7-Eleven Counterfeit Products by the 7-Eleven Stores, and 7-Eleven and the 7-Eleven Stores have an apparent or actual partnership, have authority to bind one another in transactions with third parties, and/or exercise joint ownership or control over the 7-Eleven Counterfeit Products. Specifically, 7-Eleven (i) has or has access to records reflecting the 7-Eleven Counterfeit Products being sold at its stores; (ii) has inventory management systems and technology that tracks, identifies and analyzes merchandise being sold at 7-Eleven stores; (iii) maintains control and/or approval over which categories of products, and specific products, 7-Eleven Stores offer; and (iv) has and exercises the right to conduct audits of 7-Eleven Stores, including of the products 7-Eleven Stores

offer.  Despite exercising its right and ability to control by supervising the 7-Eleven Stores' operations, including the sale of 7-Eleven Counterfeit Products, 7-Eleven failed to exercise this control to prevent and stop this infringement.

205.  7-Eleven has received direct financial benefit from the acts of infringement through its share of the revenue and profits gained from the 7-Eleven Stores' sales of 7-Eleven Counterfeit Products, and additional competitive advantages gained by leveraging the popularity of the LABUBU Products to draw consumers to its stores to make additional purchases.

206.  7-Eleven has engaged in acts of infringement, with knowledge of POP MART Singapore and POP MART Beijing's exclusive rights in and to the POP MART Registered Marks, and 7-Eleven continues in such acts of intentional infringement, thus entitling POP MART Singapore and POP MART Beijing to an award of treble damages, disgorgement of 7-Eleven's profits, and attorneys' fees and costs in bringing and maintaining this action, pursuant to 15 U.S.C. § 1117.

207.  Unless Defendants are enjoined by this Court from so doing, POP MART Singapore and POP MART Beijing will continue to suffer irreparable harm and injury to their goodwill and reputation in the marketplace that money cannot compensate.

## SEVENTH CAUSE OF ACTION

### (Trademark Infringement and False Designation of Origin– 15 U.S.C. § 1125)

### (By All Plaintiffs Against All Defendants)

208.  POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

209.  POP MART owns common law trademark rights in the POP MART Marks, and all such rights owned by POP MART are superior to any rights that the Defendants may claim to have in the Counterfeit Marks.

210.  Defendants' unauthorized use of the Counterfeit Marks in interstate commerce in connection with the 7-Eleven Counterfeit Products constitutes a false

designation of origin, false and misleading representations of fact, which have caused, and are likely to cause, confusion, mistake, and deception in violation of 15 U.S.C. § 1125(a).

211.   Defendants' promotion, distribution, sale and offering for sale of the 7-Eleven Counterfeit Products bearing the POP MART Marks is intended to cause, has caused, and is likely to cause confusion, mistake, or deceit as to the affiliation, connection, or association of Defendants and the 7-Eleven Counterfeit Products with POP MART, or as to the origin, sponsorship, approval of Defendants' goods, services, or commercial activities by POP MART.

212.   Confusion is even more likely due to the fact that the Counterfeit Marks prominently incorporate the key components of the POP MART Marks, including: (i) a square containing the stylized terms "POP MART" with "POP" appearing above "MART"; (ii) the stylized wording "POP MART" with a shaded rectangle; (iii) the characters "POP MART" without any particular font style, size, or color; (iv) the wording "THE MONSTERS" underneath a stylized silhouette of an elf lying down on the word "MONSTERS"; (v) the characters "LABUBU" without any particular font style, size, or color; (vi) the stylized words "EXCITING MACARON" with the text "EXCITING" above "MACARON"; (vii) the characters "EXCITING MACARON" without any particular font style, size, or color; (viii) the stylized words "BIG INTO ENERGY" with the text "BIG INTO" above "ENERGY"; (ix) the characters "BIG INTO ENERGY" without any particular font style, size, or color; (x) the stylized words "HAVE A SEAT" with the text "A" between and slightly below "HAVE" and "SEAT"; (xi) the characters "HAVE A SEAT" without any particular font style, size, or color; (xii) the stylized words "LAZY YOGA" with the text "LAZY" above "YOGA"; (xiii) the characters "LAZY YOGA" without any particular font style, size, or color; and (xiv) the characters "ZIMOMO" without any particular font style, size, or color.

1    213.   Defendants' acts of trademark infringement are continuing to be

2    committed willfully, knowingly, intentionally, and in bad faith.

3    214.   Defendants' acts of trademark infringement will continue to cause POP

4    MART irreparable damage, loss, and injury for which POP MART has no adequate

5    remedy at law.  The damage to POP MART includes harm to its goodwill and business

6    reputation in the marketplace that money cannot compensate.

7    **EIGHTH CAUSE OF ACTION**

8    **(Contributory Trademark Infringement and False Designation of Origin– 15**

9    **U.S.C. § 1125)**

10    **(By All Plaintiffs Against 7-Eleven)**

11    215.   POP MART repeats and realleges each and every allegation contained in

12    the preceding paragraphs as if set forth herein in full.

13    216.   POP MART owns common law trademark rights in the POP MART

14    Marks and all such rights owned by POP MART are superior to any rights that the 7-

15    Eleven may claim to have in the Counterfeit Marks.

16    217.   As described above, the 7-Eleven Stores' unauthorized use of the

17    Counterfeit Marks in interstate commerce in connection with the 7-Eleven Counterfeit

18    Products constitutes a false designation of origin, false and misleading representations

19    of fact, which have caused, and are likely to cause, confusion, mistake, and deception

20    in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

21    218.   7-Eleven is contributorily liable for these direct infringements by its

22    franchise as described herein.  7-Eleven has actual knowledge or reason to know of

23    the infringement, including because 7-Eleven (i) has or has access to receipts

24    reflecting the 7-Eleven Counterfeit Products being sold at its stores; (ii) has inventory

25    management systems and technology that identify and analyze merchandise being

26    sold at 7-Eleven stores; (iii) maintains control and/or approval over which categories

27    of products, and specific products, 7-Eleven Stores offer; and (iv) has and exercises

28    the right to conduct audits of 7-Eleven Stores, including of the products 7-Eleven

Stores offer.  7-Eleven's knowledge of 7-Eleven Counterfeit Products being sold in its stores is confirmed, *inter alia*, by its reply on the official 7-Eleven X account, to a report of such a product (including a photograph of it), to which it replied "We're sorry to hear this!" and requesting further details.  7-Eleven has knowledge of and control over the merchandise sold in each 7-Eleven store, including 7-Eleven Stores.

219.  Nevertheless, 7-Eleven facilitates, encourages, and materially contributes to such infringement, including by supplying 7-Eleven Counterfeit Products to its stores and/or allowing its stores to obtain them, and by continuing to permit its stores to sell the 7-Eleven Counterfeit Products.  At all relevant times, 7-Eleven has derived a direct financial benefit from the sale of the 7-Eleven Counterfeit Products.  7-Eleven has the means to take simple steps not to materially contribute to the specific infringing activity but fails to do so.  Instead, 7-Eleven continues to permit its stores, including its franchisees, to sell the 7-Eleven Counterfeit Products, and actively facilitates the ongoing infringement.

220.  7-Eleven's acts of trademark infringement are continuing to be committed willfully, knowingly, intentionally, and in bad faith.

221.  7-Eleven's acts of trademark infringement will continue to cause POP MART irreparable damage, loss, and injury for which POP MART has no adequate remedy at law.

222.  The damage to POP MART includes harm to its goodwill and business reputation in the marketplace that money cannot compensate.

## NINTH CAUSE OF ACTION

**(Vicarious Trademark Infringement and False Designation of Origin– 15 U.S.C. § 1125)**

**(By All Plaintiffs Against 7-Eleven)**

223.  POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

224.  POP MART owns common law trademark rights in the POP MART Marks and all such rights owned by POP MART are superior to any rights that 7-Eleven may claim to have in the Counterfeit Marks.

225.  As described above, the 7-Eleven Stores' unauthorized use of the Counterfeit Marks in interstate commerce in connection with the 7-Eleven Counterfeit Products constitutes a false designation of origin, and false and misleading representations of fact, which have caused, and are likely to cause, confusion, mistake, and deception in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

226.  7-Eleven is vicariously liable for these direct infringements by its 7-Eleven Stores as described herein.  7-Eleven exerts significant control over the selection, distribution, placement, and sale of the 7-Eleven Counterfeit Products by the 7-Eleven Stores, and 7-Eleven and the 7-Eleven Stores have an apparent or actual partnership, have authority to bind one another in transactions with third parties, and/or exercise joint ownership or control over the Infringing Product.  Specifically, 7-Eleven (i) has or has access to records reflecting the 7-Eleven Counterfeit Products being sold at its stores; (ii) has inventory management systems and technology that identify and analyze merchandise being sold at 7-Eleven stores; (iii) maintains control and/or approval over which categories of products, and specific products, 7-Eleven Stores offer; and (iv) has and exercises the right to conduct audits of 7-Eleven Stores, including of the products 7-Eleven Stores offer.  Despite exercising its right and ability to control by supervising the 7-Eleven Stores' operations, including the sale of 7-Eleven Counterfeit Products, 7-Eleven failed to exercise this control to prevent and stop this infringement.

227.  7-Eleven has received direct financial benefit from the acts of infringement through its share of the revenue and profits gained from the 7-Eleven Stores' infringing sales, and additional competitive advantages gained by leveraging the popularity of the LABUBU Products to draw consumers to its stores to make additional purchases.

228.  7-Eleven's acts of trademark infringement are continuing to be committed willfully, knowingly, intentionally, and in bad faith.

229.  7-Eleven's acts of trademark infringement will continue to cause POP MART irreparable damage, loss, and injury for which POP MART has no adequate remedy at law.

230.  The damage to POP MART includes harm to its goodwill and business reputation in the marketplace that money cannot compensate.

## TENTH CAUSE OF ACTION

### (Federal Trade Dress Infringement – 15 U.S.C. § 1125)

### (By All Plaintiffs Against All Defendants)

231.  POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

232.  POP MART owns and has a protectable interest in the LABUBU Trade Dress.

233.  As owner of all rights, title, and interest in and to the LABUBU Trade Dress, POP MART has standing to maintain an action for trade dress infringement under the Lanham Act, including 15 U.S.C. § 1125.

234.  The LABUBU Trade Dress is nonfunctional and highly distinctive and has become associated in the public mind with vinyl plush toy products of the highest quality and reputation, finding their origin in a single source—POP MART.

235.  The LABUBU Trade Dress has acquired secondary meaning based upon, at least in part, the amount and manner of POP MART's advertising of products embodying the LABUBU Trade Dress, the volume of sales, as well as the length and manner of use of the products.

236.  The LABUBU Trade Dress is nonfunctional because (i) its distinctive aesthetic features yield no utilitarian advantage; (ii) there are innumerable alternative stylistic vinyl plush toy features available to competitors; (iii) even if there were some utilitarian advantages of the design; (iv) POP MART's advertising does not tout or

market those advantages; and (v) the LABUBU Trade Dress is not the result of comparatively simple or inexpensive methods of manufacture.  Furthermore, protection of the specific combination of the aesthetic features of the LABUBU Trade Dress would not impose a non-reputation-related competitive disadvantage against competitors, as there are innumerable alternative design elements and combinations of those elements for competitors to utilize.  The combination of the LABUBU Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function; rather, the highly distinctive LABUBU Trade Dress is intended to, and does, distinguish POP MART's products from those of competitors.

237.   Without POP MART's authorization or consent, and having knowledge of POP MART's prior rights in the LABUBU Trade Dress, Defendants have advertised, offered for sale and/or will continue to advertise, offer for sale, and sell replicas of the LABUBU Trade Dress to the consuming public in direct competition with POP MART, in or affecting interstate commerce.

238.   Virtually all Defendants' 7-Eleven Counterfeit Products are each, alone and together, confusingly similar to the LABUBU Trade Dress.  Defendants' use of the LABUBU Trade Dress has caused, and unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, irreparable injury to the goodwill and reputation associated with the LABUBU Trade Dress.

239.   Defendants' use of the LABUBU Trade Dress thus constitutes trade dress infringement in violation of 15 U.S.C. § 1125(a).

240.   As a direct and proximate result of Defendants' unlawful conduct, it has misappropriated POP MART's rights in the LABUBU Trade Dress, as well as the goodwill associated therewith, and has diverted sales and profits from POP MART to Defendants.  Thus, as a direct and proximate result of Defendants' acts of willful infringement, POP MART has suffered and/or will suffer irreparable damage to its

valuable brand and reputation, and other damages in an amount to be proven at trial, including Defendants' profits and POP MART's lost profits.

241.    Defendants' actions described above will cause, have caused, and will continue to cause irreparable damage to POP MART unless Defendants are enjoined by this Court.  POP MART has no adequate remedy at law with regard to Defendants' infringing conduct.  Accordingly, POP MART is entitled to a permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using POP MART's LABUBU Trade Dress, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any products.

242.    Defendants' aforesaid acts are exceptional within the meaning of 15 U.S.C. § 1117.

<u>**ELEVENTH CAUSE OF ACTION**</u>

**(Contributory Federal Trade Dress Infringement – 15 U.S.C. § 1125)**

**(By All Plaintiffs Against 7-Eleven)**

243.    POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

244.    As described above, the 7-Eleven Stores' use of the LABUBU Trade Dress constitutes trade dress infringement in violation of 15 U.S.C. § 1125(a).

245.    7-Eleven is contributorily liable for these direct infringements by its 7-Eleven Stores as described herein.  7-Eleven has actual knowledge or reason to know of the infringement, including because 7-Eleven (i) has or has access to receipts reflecting the 7-Eleven Counterfeit Products being sold at its stores; (ii) has inventory management systems and technology that identify and analyze merchandise being sold at 7-Eleven stores; (iii) maintains control and/or approval over which categories of products, and specific products, 7-Eleven Stores offer; and (iv) has and exercises the right to conduct audits of 7-Eleven Stores, including of the products 7-Eleven Stores offer.  7-Eleven's knowledge of 7-Eleven Counterfeit Products being sold in

its stores is confirmed, *inter alia*, by its reply on the official 7-Eleven X account, to a report of such a product (including a photograph of it), to which it replied "We're sorry to hear this!" and requesting further details.  7-Eleven has knowledge of and control over the merchandise sold in each 7-Eleven store, including 7-Eleven Stores.

246.   Nevertheless, 7-Eleven failed to take reasonable measures to prevent the infringement, and in fact facilitates and encourages such infringement, including by supplying 7-Eleven Counterfeit Products to its stores and/or allowing its stores to obtain them, and by continuing to permit its stores to sell the 7-Eleven Counterfeit Products.  7-Eleven has the means to take simple steps to prevent the specific infringing activity but fails to do so.  Instead, 7-Eleven continues to permit its stores, including its franchisees, to sell the 7-Eleven Counterfeit Products, and actively facilitates the ongoing infringement.

247.   7-Eleven's actions described above will cause, have caused, and will continue to cause irreparable damage to POP MART, unless 7-Eleven is enjoined by this Court.  The damage to POP MART includes harm to its goodwill and business reputation in the marketplace that money cannot compensate.  POP MART has no adequate remedy at law with regard to 7-Eleven's infringing conduct.  Accordingly, POP MART is entitled to a permanent injunction, pursuant to 15 U.S.C. § 1116, restraining and enjoining 7-Eleven and its agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using POP MART's LABUBU Trade Dress, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any products. 7-Eleven's aforesaid acts are exceptional within the meaning of 15 U.S.C. § 1117.

## TWELFTH CAUSE OF ACTION

### (Vicarious Federal Trade Dress Infringement – 15 U.S.C. § 1125)

### (By All Plaintiffs Against 7-Eleven)

248.   POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

249.  As described above, the 7-Eleven Stores' use of the LABUBU Trade Dress constitutes trade dress infringement in violation of 15 U.S.C. § 1125(a).

250.  7-Eleven is vicariously liable for these direct infringements by its 7-Eleven Stores as described herein.  7-Eleven exerts significant control over the selection, distribution, placement, and sale of the 7-Eleven Counterfeit Products by the 7-Eleven Stores, and 7-Eleven and the 7-Eleven Stores have an apparent or actual partnership, have authority to bind one another in transactions with third parties, and/or exercise joint ownership or control over the Infringing Product.  Specifically, 7-Eleven (i) has or has access to records reflecting the 7-Eleven Counterfeit Products being sold at its stores; (ii) has inventory management systems and technology that identify and analyze merchandise being sold at 7-Eleven stores; (iii) maintains control and/or approval over which categories of products, and specific products, 7-Eleven Stores offer; and (iv) has and exercises the right to conduct audits of 7-Eleven Stores, including of the products 7-Eleven Stores offer.  Despite exercising its right and ability to control by supervising the 7-Eleven Stores' operations, including the sale of 7-Eleven Counterfeit Products, 7-Eleven failed to exercise this control to prevent and stop this infringement.

251.  7-Eleven has received direct financial benefit from the acts of infringement through its share of the revenue and profits gained from the 7-Eleven Stores' infringing sales, and additional competitive advantages gained by leveraging the popularity of the LABUBU Products to draw consumers to its stores to make additional purchases.

252.  7-Eleven's actions described above will cause, have caused, and will continue to cause irreparable damage to POP MART, unless 7-Eleven is enjoined by this Court.  The damage to POP MART includes harm to its goodwill and business reputation in the marketplace that money cannot compensate.  POP MART has no adequate remedy at law with regard to 7-Eleven's infringing conduct.  Accordingly, POP MART is entitled to a permanent injunction, pursuant to 15 U.S.C. § 1116,

restraining and enjoining 7-Eleven and its agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using POP MART's LABUBU Trade Dress, or any colorable imitation or variation thereof, in connection with the sale and/or marketing of any products.

253.   7-Eleven's aforesaid acts are exceptional within the meaning of 15 U.S.C. § 1117.

### THIRTEENTH CAUSE OF ACTION

### (Federal Unfair Competition– 15 U.S.C. § 1125(a))

### (By All Plaintiffs Against All Defendants)

254.   POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

255.   Defendants' use of the Counterfeit Marks and Counterfeit Trade Dress has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' 7-Eleven Counterfeit Products are manufactured or distributed by POP MART, or affiliated, connected, or associated with POP MART, or have the sponsorship, endorsement, or approval of POP MART.

256.   Defendants have made false representations, false descriptions, and false designations of origin of its goods in violation of 15 U.S.C. § 1125(a), and Defendants' activities have caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public and, additionally, injury to POP MART's goodwill and reputation, for which POP MART has no adequate remedy at law.

257.   Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with the POP MART Marks and the LABUBU Trade Dress, to the great and irreparable injury of POP MART.

258.   Defendants have caused and will continue to cause irreparable injury to POP MART's goodwill and business reputation, and POP MART therefore is entitled to injunctive relief and to Defendants' profits, actual damages, enhanced profits, and

1  damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1125(a),
2  1116, and 1117.

3  ### FOURTEENTH CAUSE OF ACTION

4  ### (State Statutory and Common Law Unfair Competition)

5  ### (By All Plaintiffs Against All Defendants)

6  259.   POP MART repeats and realleges each and every allegation contained in
7  the preceding paragraphs as if set forth herein in full.

8  260.   By reason of the foregoing, defendants have been, and are, engaged in
9  "unlawful, unfair or fraudulent business practices" in violation of §§ 17200 et seq. of
10  the California Business and Professional Code and acts of unfair competition in
11  violation of common law of California and other States.

12  261.   Defendants' acts complained of herein have caused and will continue to
13  cause irreparable injury to POP MART.  POP MART has no adequate remedy at law
14  for these wrongs and injuries.   The damage to POP MART includes harm to its
15  goodwill and business reputation in the marketplace that money cannot compensate.
16  POP MART is therefore entitled to, without limitation, (i) preliminary and permanent
17  injunctions restraining Defendants and their agents, servants and employees, and all
18  persons acting thereunder, in concert with or on their behalf, from using POP MART
19  Marks and the LABUBU Trade Dress, or any colorable imitation or variation thereof;
20  (ii) an accounting of Defendants' profits for all goods sold through the use of POP
21  MART Marks and the LABUBU Trade Dress; (iii) the imposition of a constructive
22  trust in favor of POP MART on all profits obtained from Defendants'
23  misappropriation of POP MART Marks and the LABUBU Trade Dress; and (iv) POP
24  MART's actual damages.

25  262.   Further, because Defendants' acts have been wanton, deliberate,
26  malicious and willful, under California Civil Code § 3294, POP MART is entitled to
27  an award of punitive damages in order to punish Defendants and to deter such
28  misconduct in the future.

## FIFTEENTH CAUSE OF ACTION

**(Federal Copyright Infringement – 17 U.S.C. §§ 101 *et seq*)**

**(By POP MART Beijing Against All Defendants)**

263.   POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

264.   At all relevant times, POP MART Beijing has been the exclusive holder of the copyrights to the POP MART Copyrighted Works.

265.   Without permission or consent of POP MART Beijing, Defendants displayed, advertised, and sold and continue to display, advertise and sell 7-Eleven Counterfeit Products.

266.   Defendants' unlawful conduct constitutes infringement of POP MART Beijing's exclusive rights protected under the Copyright Act of 1976 (17 U.S.C. §§ 101 *et seq.*).

267.   Defendants' acts of infringement have been willful, intentional, and in disregard of and with indifference to the rights of POP MART Beijing.

268.   As a direct and proximate result of Defendants' infringement, POP MART Beijing is entitled to damages and Defendants' profits pursuant to 17 U.S.C. § 504(b) for each infringement.

269.   Defendants' conduct is causing and, unless enjoined and restrained by this Court, will continue to cause POP MART Beijing substantial and irreparable harm to its business that cannot be fully compensated or measured monetarily.

270.   The damage to POP MART Beijing includes harm to its goodwill and business reputation in the marketplace that money cannot compensate.

## SIXTEENTH CAUSE OF ACTION

**(Contributory Federal Copyright Infringement – 17 U.S.C. §§ 101 *et seq*)**

**(By POP MART Beijing Against 7-Eleven)**

271.   POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

272.    At all relevant times, POP MART Beijing has been the exclusive holder of the copyrights to the POP MART Copyrighted Works.

273.    Without permission or consent of POP MART Beijing, the 7-Eleven Stores displayed, advertised, and sold and continue to display, advertise, and sell 7-Eleven Counterfeit Products.

274.    As described above, the 7-Eleven Stores' unlawful conduct constitutes infringement of POP MART's exclusive rights protected under the Copyright Act of 1976 (17 U.S.C. §§ 101 *et seq.*).

275.    7-Eleven had knowledge of the infringement, and materially contributed to the infringement, including, on information and belief, by approving the sale of and/or supplying the 7-Eleven Counterfeit Products.  7-Eleven's knowledge and material contribution are evidenced by the fact that 7-Eleven exerts significant control over the selection, distribution, placement, and sale of the 7-Eleven Counterfeit Products by the 7-Eleven Stores, and 7-Eleven and the 7-Eleven Stores have an apparent or actual partnership, have authority to bind one another in transactions with third parties, and/or exercise joint ownership or control over the Infringing Product.  Specifically, 7-Eleven (i) has or has access to records reflecting the 7-Eleven Counterfeit Products being sold at its stores; (ii) has inventory management systems and technology that identify and analyze merchandise being sold at 7-Eleven stores; (iii) maintains control and/or approval over which categories of products, and specific products, 7-Eleven Stores offer; and (iv) has and exercises the right to conduct audits of 7-Eleven Stores, including of the products 7-Eleven Stores offer.

276.    7-Eleven's acts of infringement have been willful, intentional, and in disregard of and with indifference to the rights of POP MART Beijing.

277.    As a direct and proximate result of 7-Eleven's infringement of POP MART Beijing's copyrights, POP MART Beijing is entitled to damages and 7-Eleven's profits pursuant to 17 U.S.C. § 504(b) for each infringement.

278.    7-Eleven's conduct is causing and, unless enjoined and restrained by this Court, will continue to cause POP MART Beijing substantial and irreparable harm to its business that cannot be fully compensated or measured monetarily.  The damage to POP MART Beijing includes harm to its goodwill and business reputation in the marketplace that money cannot compensate.

279.    As a direct and proximate result of 7-Eleven's infringing actions, POP MART Beijing has suffered damage to its business and will continue to suffer damage to its business.

### SEVENTEENTH CAUSE OF ACTION

### (Vicarious Federal Copyright Infringement – 17 U.S.C. §§ 101 *et seq*)

### (By POP MART Beijing Against 7-Eleven)

280.    POP MART repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

281.    At all relevant times, POP MART Beijing has been the exclusive holder of the copyrights to the POP MART Copyrighted Works.

282.    Without permission or consent of POP MART Beijing, the 7-Eleven Stores displayed, advertised, and sold and continue to display, advertise, and sell 7-Eleven Counterfeit Products.

283.    The 7-Eleven Stores' unlawful conduct constitutes infringement of POP MART Beijing's exclusive rights protected under the Copyright Act of 1976 (17 U.S.C. §§ 101 *et seq.*).

284.    7-Eleven's acts of infringement have been willful, intentional, and in disregard of and with indifference to the rights of POP MART Beijing.

285.    7-Eleven had the right and ability to control the infringement (by virtue of its rights of control and audit over the 7-Eleven Stores), and received a direct financial benefit from the infringement (by virtue of increased revenue as a result of the sales of 7-Eleven Counterfeit Products).  Specifically, 7-Eleven exerts significant control over the selection, distribution, placement, and sale of the 7-Eleven

Counterfeit Products by the 7-Eleven Stores, and 7-Eleven and the 7-Eleven Stores have an apparent or actual partnership, have authority to bind one another in transactions with third parties, and/or exercise joint ownership or control over the Infringing Product. Specifically, 7-Eleven (i) has or has access to records reflecting the 7-Eleven Counterfeit Products being sold at its stores; (ii) has inventory management systems and technology that identify and analyze merchandise being sold at 7-Eleven stores; (iii) maintains control and/or approval over which categories of products, and specific products, 7-Eleven Stores offer; and (iv) has and exercises the right to conduct audits of 7-Eleven Stores, including of the products 7-Eleven Stores offer. Despite exercising its right and ability to control by supervising the 7-Eleven Stores' operations, including the sale of 7-Eleven Counterfeit Products, 7-Eleven failed to exercise this control to prevent and stop this infringement.

286.  As a direct and proximate result of 7-Eleven's infringement of POP MART Beijing's copyrights, POP MART Beijing is entitled to damages and 7-Eleven's profits pursuant to 17 U.S.C. § 504(b) for each infringement.

287.  7-Eleven's conduct is causing and, unless enjoined and restrained by this Court, will continue to cause POP MART Beijing substantial and irreparable harm to its business that cannot be fully compensated or measured monetarily. The damage to POP MART Beijing includes harm to its goodwill and business reputation in the marketplace that money cannot compensate.

288.  As a direct and proximate result of 7-Eleven's infringing actions, POP MART Beijing has suffered damage to its business and will continue to suffer damage to its business.

## **RELIEF SOUGHT**

WHEREFORE, Plaintiffs hereby request that this Court Order as follows:

a.    That Defendants, their officers, members, directors, agents, servants, employees, successors, licensees, representatives, assigns, and all persons acting in concert or participation with them, be permanently enjoined and restrained from:

1  (i)    Manufacturing, distributing, advertising, offering to sell or selling

2  the 7-Eleven Counterfeit Products;

3  (ii)    Manufacturing, distributing, advertising, offering to sell or selling

4  any good with any colorable imitation(s) of the POP MART Marks, the LABUBU

5  Trade Dress, or the POP MART Copyrighted Works;

6  (iii)    Infringing or contributing to infringement of the POP MART

7  Marks, the LABUBU Trade Dress, or the POP MART Copyrighted Works, or

8  otherwise engaging in unfair competition with POP MART in any manner, or

9  engaging in any conduct tending to falsely represent or likely to confuse, mislead, or

10  deceive suppliers, purchasers, or any member of the public into thinking that

11  Defendants or any of their products are affiliated with POP MART or that POP

12  MART has otherwise sponsored, approved, or licensed any products or services of

13  Defendants;

14  (iv)    Assisting, aiding, or abetting any other person or business entity

15  in engaging or performing any of the activities referred to in subparagraphs (i) through

16  (iii) above, or effecting any assignments or transfers, forming new entities or

17  associations, or utilizing any other device for the purpose of circumventing or

18  otherwise avoiding the prohibitions set forth in subparagraphs (i) through (ii) above.

19  b.    That Defendants be directed to file with the Court and serve on POP

20  MART, within thirty (30) days after entry of a final injunction, a report in writing

21  under oath setting forth in detail the manner and form in which Defendants have

22  complied with the injunction;

23  c.    That the Court affirms and declares that POP MART has superior rights

24  to exclusive use of the POP MART Marks, the POP MART Copyrighted Works, and

25  the LABUBU Trade Dress;

26  d.    That the Court direct any third parties providing services to Defendants

27  in connection with any infringing and/or enjoined conduct, including social media

28  platforms, online marketplaces, online payment providers, including credit card

companies and other service providers to cease providing services to Defendants in connection with the offer for sale and sale of the 7-Eleven Counterfeit Products or any other products using, infringing, or embodying the POP MART Marks, the LABUBU Trade Dress, or the POP MART Copyrighted Works;

e.    That Defendants be required to pay POP MART such damages as it has sustained as a consequence of Defendants' infringement of the LABUBU Trade Dress and the POP MART Copyrighted Works.

f.    That Defendants be required to pay POP MART such damages as it has sustained as a consequence of Defendants' infringement of the POP MART Marks and trebling of those damages;

g.    Adjudge that the Defendants, by their unauthorized use of the Counterfeit Marks and Counterfeit Trade Dress for vinyl plush toys, and other acts as they may have undertaken relating to the POP MART Marks, the LABUBU Trade Dress, and/or POP MART Copyrighted Works, are in violation of 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), and 17 U.S.C. § 501(a), and under common law, and that they have done so willfully;

h.    Direct Defendants to provide an identification in writing of any and all 7-Eleven locations that are presently using the POP MART Marks, the LABUBU Trade Dress, or the POP MART Copyrighted Works and inform them that they must immediately cease such use;

i.    Direct Defendants to immediately recall any and all merchandise previously provided to any entity embodying or using the POP MART Marks, the LABUBU Trade Dress, or the POP MART Copyrighted Works;

j.    Enter an order, pursuant to 15 U.S.C. § 1118, directing Defendants to deliver to POP MART all products, brochures, marketing materials, decals, stickers, signs, prints, packages, receptacles, wrappers, boxes, and advertisements in their possession or under their control, embodying any unauthorized copy of the LABUBU Trade Dress or any of the POP MART Copyrighted Works or the POP MART Marks,

or any simulation, reproduction, counterfeit, copy, confusingly similar likeness, or colorable imitation therefor, and all plates, molds, matrices, programs, and other means of making the same;

k.    That Defendants provide in writing the following information relating to each type of Defendants' goods marketed, advertised, offered for sale, or sold in violation of one or more of the POP MART Marks, the LABUBU Trade Dress, and/or the POP MART Copyrighted Works:

(i)    the name, address, and telephone number of each and every 7-Eleven location where any such product is or has been available;

(ii)    the total number of units distributed and sold;

(iii)    the total number of units remaining in inventory; and

(iv)    a full accounting as to the precise dollar amount of such products made available or provided and the profits recognized by Defendants in connection with such actions;

l.    Direct Defendants to pay the costs of corrective advertising;

m.    Direct Defendants to pay POP MART's attorneys' fees and costs incurred in initiating and prosecuting this action;

n.    That POP MART recover its actual damages, POP MART's lost profits, and Defendants' profits arising from Defendants' conduct complained of herein, including any profits that are attributable to the infringement and are not taken into account in computing the actual damages;

o.    That the Court award enhanced and treble damages;

p.    That the Court award exemplary or punitive damages;

q.    That POP MART be awarded interest, including pre-judgment interest, on the foregoing sums;

r.    That the Court direct such other actions as it may deem just and proper to prevent the public from deriving the mistaken impression that products or services

1  offered, advertised, or promoted by or on behalf of Defendants are authorized by POP

2  MART or related in any way to POP MART's products or services; and

3        s.    For such other and further relief as the Court may deem just and proper.

4  **<u>DEMAND FOR JURY TRIAL</u>**

5  Plaintiffs respectfully request a jury trial on all issues triable thereby.

6

7  DATED:  July 18, 2025               QUINN EMANUEL URQUHART &
8                                  SULLIVAN, LLP

9

10  By  */s/ Michael T. Zeller*

11  MICHAEL T. ZELLER (Bar No. 196417)
    michaelzeller@quinnemanuel.com

12  DIANE L. CAFFERATA (Bar No. 190081)
    dianecafferata@quinnemanuel.com

13  DANIEL C. POSNER (Bar No. 232009)
    danposner@quinnemanuel.com

14  865 S. Figueroa St., 10th Floor

15  Los Angeles, CA 90017-2543

16  Telephone: (213) 443-3000
    Facsimile: (213) 443-3100

17

18

19  Attorneys for Plaintiffs POP MART

20  Americas Inc., POP MART (Singapore)
    Holding Pte. Ltd., and Beijing POP MART

21  Cultural & Creative Co. Ltd.

22

23

24

25

26

27

28

COMPLAINT